GEARY v. CAIN.

No. 4468.   Decided Jan. 3, 1927.   Rehearing Denied March 14, 1927.
(255 P. 416.)

*Hutchinson & Hutchinson,* of Salt Lake City, for appellant.

*Hurd & Hurd,* of Salt Lake City, for respondent.

THURMAN, J.

This is an action to recover damages for numerous alleged assaults by the defendant upon the person of plaintiff alleged to have occurred in Salt Lake City, Utah, on and between July 14 and December 5, 1924.

The complaint, in substance, alleges that during all of said times plaintiff resided in the Kelvin Apartments, in said city; that on July 14, 1924, defendant wrongfully, unlawfully, and maliciously assaulted, beat, maltreated, abused, and indecently assaulted her; that he then and there seized and grabbed plaintiff and violently took hold of her person and pushed her violently against the casing of the bathroom door in the apartment below plaintiff's said home, and violently seized and laid hold of her breasts and person and squeezed and maltreated the same, and then and there said, "I have a fine set of tools and no place to use them; you've got to be mine; you've got to come through;" and then and there endeavored to force and compel plaintiff to have sexual intercourse with defendant. Similar acts on the part of defendant are alleged in the complaint as having occurred on August 10, 1924, with the addition that on that occasion defendant "laid hold" of her privates and said, "when are you going to do as I want you to do?" With intent then and there to compel plaintiff to submit to and have sexual intercourse with the defendant. Similar acts on the part of defendant are alleged to have occurred on October 16, 1924, while plaintiff was still suffering physically and mentally from the aforesaid wrongful acts of the defendant, and in addition it is alleged that on that occasion defendant wrongfully, unlawfully, and maliciously seized and laid hold of plaintiff and her said person and ran his hand down the

neck of her dress and seized and laid hold of her breast and squeezed it with such force and violence and caused her such pain and suffering, mentally and physically, that plaintiff was thereby prostrated, and that she fainted and fell to the floor and was obliged to and did take to her bed because of such injuries. Similar conduct on the part of defendant with similar results to plaintiff is alleged to have occurred on December 5, 1924. All of the aforesaid acts of defendant are alleged in the complaint as having been committed without plaintiff's consent and against her will. Finally, it is alleged in the complaint, that prior to said wrongs and injuries plaintiff enjoyed good health and was free from insomnia, hideous and disturbing dreams, and other nervous complaints, but that by reason of said wrongs and injuries plaintiff was confined to her bed continually for a period of seven weeks, and was obliged to and did employ physicians and nurses to care for her during said time. It is also alleged that by reason of said wrongs and injuries she has suffered and been caused great mental and physical pain, and has been made sick, sore, and lame in her body, and particularly in her chest and breasts, to such an extent as to render her permanently injured, as she is informed and believes, and therefore alleges, that her nervous system has been so badly shocked, impaired, and injured thereby as to render it impossible for her to sleep at night, and she has thereby been caused to have hideous dreams and nightmares, and has been broken in her health and strength, and upon her information and belief alleges that said injuries will be permanent. In addition to expenses incurred for medical treatment and nurse hire, plaintiff prays for damages in the sum of $25,000.

Defendant, by way of answer to the complaint, denies each and every allegation thereof.

The jury, to whom the case was tried, rendered a verdict for the plaintiff in the sum of $15,000, as actual damages, and $5,000, as exemplary damages.

Defendant moved for a new trial on numerous grounds, among others that the damages were excessive, appearing to have been given under the influence of passion or prejudice.

The court entered an order that the damages be reduced to the sum of $10,000, but allowed plaintiff in addition thereto, for actual expenditures, a sum not exceeding $500. In the event plaintiff refused to allow said reduction, defendant would be granted a new trial. Plaintiff consented to the reduction; defendant's motion for a new trial was denied, and judgment was thereupon entered for $10,410. Defendant appeals. The errors relied on are certain instructions of the court and the refusal of the court to grant defendant a new trial.

It appears from the evidence that plaintiff was in possession of the Kelvin Apartments, in which she made her home, from September, 1922, until November, 1923. At that time the defendant purchased the property, and plaintiff continued as a tenant, and was employed by defendant as janitress of the apartments. Plaintiff was and is a married woman, and her husband resided with her in the apartment.

It is not our purpose in this connection to enter into detail in stating the evidence. It is sufficient for present purposes to state that the allegations of plaintiff's complaint were substantially sustained by plaintiff's testimony and in some material particulars corroborated by the testimony of other witnesses.

Appellant assigns as error the giving of instruction No. 4, which reads as follows:

"You are instructed that any wrongful touching of the person of another constitutes an assault; and, if you believe from the evidence in this case that the defendant, Addison Cain, did make an assault upon the person of the plaintiff, Rachel P. Geary, by making use of any indecent familiarity toward her, and embracing, touching, or handling her person in an indecent manner, and without her consent, then your verdict should be for the plaintiff."

The form of the exception taken by defendant was as follows:

"Defendant excepts to instruction No. 4, given by the court, and to the whole thereof, and particularly for the reason that such instruction fails to define in any manner what is a wrongful touching of the person person, under the statute, and further that said instruction fails to define what is meant by indecent familiarity towards the plaintiff, and fails to define, as a matter of law, the term, 'indecent familiarity,' and further that said instruction fails to contain the element of proof necessary on behalf of the plaintiff to justify a verdict."

As the instruction complained of contains at least two distinct propositions of law, it is doubtful if the exception was in proper form. But, as appellant, in an informal way, did refer to certain words in the instruction of which he complains, we are not inclined to be hypercritical ■ as to matters of form. We are, however, of opinion there is no merit in the exception. If there is any doubt as to what constitutes the "wrongful touching of the person," as stated in the first clause of the instruction, the doubt is solved as far as the present case is concerned by what follows in the same instruction. Making use of indecent familiarity by a male towards a female, accompanied by embracing, touching, or handling her person in an indecent manner, without her consent, is undoubtedly a "wrongful touching of the person" and constitutes an assault. As to the term "indecent familiarity," of which appellant complains, it would be a sad commentary upon the intelligence of the jury if we should hold that it was necessary for the court to explain to the jury what was meant by the term. We are assuming that the jury had ordinary common sense, and therefore clearly understood the full scope and meaning of the instruction without a kindergarten explanation by the court.

Appellant also assigns as error instruction No. 6, which reads:

"The court charges you that the law presumes some damage results from every wrongful assault."

The objection to this instruction is that the court failed to define the legal meaning and import of the words "wrongful assault." The jury, as we have seen, had already been instructed as to what constituted an assault. They certainly must have understood that the term "wrongful assault" meant nothing more nor less than the term "assault" as defined in instruction No. 4 above quoted. But instruction No. 4 was not the only instruction given as to what constitutes an assault in a case of this nature. In instruction No. 8 the jury were instructed:

"The court instructs you that, if a man takes improper liberties with a female, or touches, or fondles, or handles her person against her will and without her consent, he is guilty of an assault."

Appellant, however, assigns as error the giving of the instruction last quoted, for the reason that the court failed to define the term "improper liberties with a female." Much that we have already said in connection with the exceptions heretofore considered is equally applicable here. We are compelled to assume that even a tyro in this day and age of the world, in this country at least, knows what is meant by "improper liberties with a female." If he does not, it might be to his interest to learn the meaning of the term in order to keep out of trouble. We find no error in the instructions to the jury.

The principal and most important question presented on this appeal is raised by appellant's assignment that the damages awarded by the jury are excessive, appearing to have been given under the influence of passion or prejudice, and that the trial court abused its discretion in denying defendant's motion for a new trial.

The only circumstance before the court tending to show that the jury were influenced by passion or prejudice is the amount of the verdict. The verdict of a jury may be excessive, and, in the opinion of the court, may not, as to amount, be fully sustained by the evidence, but it does not necessarily follow that the jury were influenced by passion

or prejudice. In such cases it has become the settled rule in this and many other jurisdictions that the trial court has the power to require the plaintiff to remit a portion of the damages or defendant will be granted a new trial.

In support of appellant's contention that the trial court abused its discretion in denying appellant's motion for a new trial, his counsel call our attention to the following cases decided by this court: Browning v. Bank of Vernal, 60 Utah, 197, 207 P. 462; Stephens Ranch & Livestock Co. v. Railroad Co., 48 Utah, 528, 161 P. 459.

In each of the above cases a new trial was applied for in the court below on the ground of excessive damages given under the influence of passion or prejudice. The motion for a new trial in each case was denied by the trial court. On appeal to this court, the judgment was affirmed. The cases are relied on here, not because the court sustained appellant's contentions in the cases referred to, but evidently because of something said in the course of the opinions. In the case last cited, the court, speaking through Mr. Justice Frick, at page 538 (161 P. 463) use the following language, which appellant quotes in his brief:

"We can discover nothing in this case, except the amount allowed, which indicates passion or prejudice, and, as we have seen, passion or prejudice may not be inferred alone from the fact that an excessive amount is allowed by a jury, unless the amount is so grossly excessive that it shocks the ordinary man's sense of justice."

It is earnestly contended by appellant that the excessive verdict in the case at bar is persuasive that the jury were influenced by passion or prejudice. In that connection appellant's counsel also say:

"We are unable to conceive how a trial judge could reduce a verdict in the sum of $10,000, under the facts proven in this case, and not be of opinion that the verdict was obtained with passion and prejudice."

Counsel for appellant assume in their argument that if the verdict was rendered under the influence of passion and

prejudice, it necessarily followed that the motion for a new trial should have been allowed. Mr. Justice Frick, in the case last cited, at page 537 (161 P. 462), seemed inclined to that opinion; but upon that proposition the other members of the court withheld their concurrence.

In Jensen v. Railroad Co., 44 Utah, 100, 138 P. 1185, the same question was again involved. The court, speaking through Mr. Justice Straup, after stating, in effect, the right of a litigant, in a case of tort, to the unprejudiced judgment of a jury, at page 121, 122 (138 P. 1192), said:

"Still the jury cannot be permitted to go unbridled and unchecked. Hence the Code that a new trial on motion of the aggrieved party may be granted by the court below on the ground of 'excessive damages appearing to have been given under the influence of passion or prejudice.' Whenever that is made to appear, the court, when its action is properly invoked, should require a remission or set the verdict aside and grant a new trial. But, before the court is justified to do that, it should clearly be made to appear that the jury totally mistook or disregarded the rules of law by which the damages were to be regulated, or wholly misconceived or disregarded all the evidence, and by so doing committed gross and palpable error by rendering a verdict so enormous or outrageous or unjust as to be attributable to neither the charge nor the evidence, but only to passion or prejudice. Whether a new trial should or should not be granted on this ground, of necessity, must largely rest within the sound discretion of the trial court. Still that court, in such particular, is not supreme or beyond reach. Its action may nevertheless be inquired into and reviewed on an alleged abuse of discretion, or a capricious or arbitrary exercise of power in such respect. Such a review is not a review of a question of fact, but of law. A ruling granting or refusing a motion for a new trial is certainly reviewable when the proceedings with respect to it are properly preserved and presented. That has not been questioned. Of course the ruling will not be disturbed on evidence in conflict or on matters involving discretion. Yet our power to correct a plain abuse of discretion or undo a mere capricious or arbitrary exercise of power cannot be doubted."

In that case the opinion was unanimous, and the judgment was affirmed. So it cannot be contended that it is a settled rule in this jurisdiction that the trial court may not

reduce a verdict and deny a new trial, even though it be of opinion the verdict was the result of passion or prejudice.

Reverting again to the Stephens Ranch Case, supra, we quote from the opinion at pages 537, 538 (161 P. 462), the following excerpt, which undoubtedly states the correct rule on the question here involved:

"But it does not necessarily follow that because the jury returns a verdict in which a greater sum is allowed than is authorized by the evidence for that reason alone the verdict is the result of passion or prejudice. If such were the rule, all cases in which excessive verdicts are returned would have to be retired. In *Jensen* v. *Denver & R. G. R. Co.*, 44 Utah, 100, 138 P. 1192, 1193, this court has clearly indicated under what circumstances the amount of the verdict may be reduced and when a new trial because of an excessive verdict may be granted. Necessarily upon such a question appellate courts must, to a large extent, rely upon the judgment and discretion of the trial court. That court is in a much better position to observe and determine whether a jury was actuated by passion or prejudice, or by both, in returning a verdict for an amount larger than the evidence justifies, or whether the jury was merely mistaken with regard to the amount that should have been allowed. The jury may merely have misjudged the evidence, or may have erred in their judgment respecting the amount that should be allowed, and if such is the case the whole verdict is not tainted, and the error may be cured by requiring the plaintiff to remit the excess. To that effect are all of the modern authorities. In *Gila Valley G. & N. Ry. Co.* v. *Hall*, 13 Ariz. 270, 112 P. 845, what we deem to be the correct rule is stated by the Supreme Court of Arizona in the fifth headnote, thus: 'Unless it clearly appears from the court record that an excessive verdict in a personal injury action resulted from prejudice or passion rather than an undue liberality exercised by the jury in awarding damages, the trial court's action in remitting a part of the verdict instead of granting a new trial will not be disturbed.' "

It is perhaps unnecessary to state that a question of this kind is difficult to determine. Ordinarily, if there is any substantial evidence to sustain a verdict in an action at law, this court is powerless to set it aside. Such is the general rule reiterated and reaffirmed at almost every term of the court. There can be no dispute as to that.

As tersely stated by Mr. Justice Straup, speaking for the court in the Jensen Case, supra:

"A court, vacating a verdict and granting a new trial by merely setting up his opinion or judgment against that of the jury, but usurps judicial power and prostitutes the constitutional trial by jury."

But, as also stated by him in the next sentence, "Still the jury cannot be permitted to go unbridled and unchecked."

The statute contemplates that a new trial may be granted when the verdict, as to amount, is excessive as a result of passion or prejudice. It has, however, become the settled practice, as before stated, in this and many other jurisdictions, to remit portions of an excessive verdict with the consent of the prevailing party and thereupon deny the motion for a new trial. This is usually done by the trial court, but has rarely if ever been done by this court on appeal.

Assuming that this court has the power, in cases of this kind, to review the evidence for the purpose of determining whether the trial court abused its discretion in denying defendant's motion for a new trial, it becomes our duty to enter into greater detail in considering the evidence that we have hitherto done. We have heretofore referred to the relation of the parties, and shown that prior to November, 1923, plaintiff had been in possession of the apartments for a period of about eighteen months. She held possession under some kind of a contract from the owner. In November, 1923, the defendant purchased the apartments and plaintiff thereafter became a tenant of defendant and also janitress of the apartments. As far as that relation was concerned, it appears that plaintiff was to pay to the defendant $15 per month as rent for the apartment she and her husband occupied, and be credited by defendant with $25 per month for services as janitress. The total rental paid for the apartment was $40 per month. But plaintiff insisted throughout the trial that she had other interests in the apartments by virtue of some oral contract or understanding with the de-

fendant. Her contention in this regard may or may not have any substantial foundation. The defendant denied any such understanding, and, it being in a large sense an immaterial issue in the case, the evidence relating thereto was treated either as incompetent or immaterial. It is only material here to state that, whether or not she had any legal claim against the defendant, she nevertheless seemed to think she had, and that mental attitude is important in characterizing some of her conduct in respect to the alleged wrongs and injuries complained of. She seemed to be deeply concerned for fear she would lose her home, as she called it. Her first acquaintance with the defendant was shortly before defendant purchased the apartment. It appears plaintiff was in financial straits and needed a loan of $200. This sum was obtained through the defendant, as security for which she assigned to him her contract for the purchase of the apartment and placed her papers relating thereto in his hands. In addition to her duties as janitress, it appears she sometimes collected rent from other tenants, which amounts she paid to the defendant and took his receipt therefor.

The first conduct of defendant complained of by plaintiff, as alleged in the complaint, occurred July 14, 1924. Plaintiff testified that at that time her health was good, that it had never been better in her life, and that she had never weighed more. On that occasion defendant came to her apartment. Plaintiff showed him some cleaning she was having done in the apartment below. He said, "That is fine; anything you do is all right." She then took him through the rooms and showed him the bathrooms that had been painted. He said: "That is fine; everything is all right; but, dear little baby, I don't care for this. I didn't go into this for this house. I have 200 houses. I don't want these apartments. It is you, and you only, that I want in it to have the best of everything. Anything that you do is all right, but you must please me." She testified that at that he put his arms around her and patted her face and kissed her, and said:

"Dear little baby, it is you I want. That man of yours is too old for you. I am the man you should have; lean your head on my bosom, be mine, trust me." She pushed him off, and said, "Mr. Cain, you have a wife and I have a husband; you must be honorable." He said his wife was an invalid and could never be a wife to him, and then said: "Your man is too old for you; get rid of him, push him out. Do as I want you to and you will never know what worry, what sorrow, is." Plaintiff then said: "Mr. Cain, I want business, nothing but business. I have my husband's love; I don't want yours. I want business." Plaintiff testified that defendant then grabbed her and held her tight, and said, "You have got to be mine," and then pushed her against the bathroom door and put his hand down her dress in front and grabbed her breast and squeezed it; that he held her in his arms against the bathroom door and "banged her" (plaintiff here described some movement of defendant's body); that defendant said again, "You must be mine." Plaintiff said: "Let loose or I will scream." Defendant then said: "You know what that will mean. I have everything in my power, little baby. If you scream, I will put you out in the street. I can take everything. You know I have all the papers and everything." Plaintiff then testified that defendant banged her again with his body like that (making motions). Plaintiff says she was overcome, horrified, indignant, and broken-hearted to think that any man would dare touch her and abuse her in such a manner. Plaintiff further testified that defendant banged her in the manner indicated and grabbed her here (indicating), and then said: "I have as fine a set of tools as there ever was, and I have no place to use them. You must do as I want you to; you must please me, or you will go out in the street." Plaintiff says she nearly fell, she was so broken-hearted and grief-stricken; that defendant hurt her with his grabbing and could see that his loving words would not make her yield; that she got loose as soon as she could and ran up to her apartment.

In detailing the testimony as to what occurred on this occasion, I have gone more into detail than will be necessary in stating the evidence relating to subsequent occasions, for the reason that there is more or less similarity in the conduct of the defendant, as described by plaintiff, on all of the occasions set forth in her complaint. The same kind of solicitations and the same kind of promises that he would take care of her and that she need not worry, requesting her to get rid of the old man, accompanied with suggestions that he had her in his power and that she must do as he wanted her to do, the grabbing and squeezing of her person in delicate parts, according to her testimony, was again repeated, in spite of her protests, resistance, and pleadings to desist.

On the occasion in October, 1924, which is one of the occasions charged in the complaint, plaintiff testified that defendant hurt her so badly that she fainted and fell to the floor; that she became ill and was confined to her bed for a period of about seven weeks; that she was compelled to employ physicians and nurses to treat and take care of her and incur the expense incident thereto. She attributed her condition solely to the assaults that had been made upon her by defendant. She stated that her nerves were shattered; that she could not sleep, and was subject to hideous dreams and nightmares such as she had never experienced before; that she lost weight; that before the alleged wrongs complained of she weighed 115 pounds; that in consequence of the wrongs inflicted her weight was reduced to 93 pounds; that she thought she was going to die; that she had never told her husband or any one else up to that time; she was afraid her husband would kill the defendant; she had desired to get along peaceably with the defendant; she wanted to save her home. When she became seriously ill, she felt she ought to tell her husband, and did so, but exacted from him a solemn promise that he would do nothing rash. She also communicated the facts to one or two of her close friends. She also consulted a deputy sheriff, Mr. Smith, and an assistant

county attorney, Mr. Tingey. She was advised by her physician to go away and take a rest. She concluded to do so, but before going desired a settlement, as she called it, with the defendant. She claimed he had promised to give her a contract to purchase the apartment upon her repaying what it had cost him, with interest thereon. Her testimony indicates that she was very much concerned about her home and wanted to save it. It appears her husband was not engaged in regular business. He helped plaintiff about the apartment, but she was the active manager of the business. It appears that she had become afraid of the defendant and did not wish to meet him again alone and unprotected. She had some rent money to pay him and had a neighbor phone and request him to come to the apartment. This was on the evening of December 5, 1924. She arranged to have present in an adjoining room two or three friends, including the deputy sheriff to whom we have referred. She was ill and was lying on the sofa when defendant came. It was about 7 o'clock p. m. She let him in and returned to the sofa and sat down. She told defendant she desired to go away to her sister's for a few months, and wished he would make a settlement with her in writing so she could be at ease on the business relating to her home. Then, according to plaintiff's testimony, defendant told her as on former occasions "not to worry, to get rid of her husband, throw him out." She was very weak and was lying on the couch at this time. She says that defendant put his hand down her clothing onto her breast, squeezed it, and said, "You are weak; don't worry so much; I will take care of you, dear little baby." The testimony shows that plaintiff resisted by removing his hand and said she wanted him to give her a contract—something in writing—so that her mind could be clear, could be at rest and quiet. The testimony shows also that at that time he felt of her lower limbs and held her on the couch. She had armed herself on this occasion with an ice pick and had it in her stocking, resolved, as she said, to use it in the event defendant undertook to

"bang her and hurt her as he had done before." The defendant in feeling of her person discovered this weapon and laughingly told her she ought to use a gun. She insisted that he write out a contract giving her the right to purchase the apartment. He wrote an option in duplicate for the purchase of his interest in the apartment for the sum of $1,500, payable in 30 days. The witnesses in the adjoining room were in a position to see and hear. In the main they corroborated the testimony of the plaintiff as to what occurred. They saw defendant put his hand upon her breast and legs and saw her remove his hand therefrom and heard her insist upon a contract for the purchase of the apartment. The deputy sheriff testified he was there to arrest the defendant if he had resorted to violence as alleged on former occasions. Plaintiff testified that defendant was not so violent on this occasion as on previous ones.

Such are the main features of the testimony concerning the alleged assaults, except that, in order to avoid prolixity, we have not stated in detail what occurred on every occasion.

The nurse employed by plaintiff testified in plaintiff's behalf. The witness had been a practical nurse for 20 years. She was called to attend plaintiff November 15, 1924. She found plaintiff had a nervous breakdown. She suffered with considerable pain in her chest and head. Plaintiff did not want to be left alone. Whenever witness would leave her, plaintiff would say, "Oh come back here; don't leave me alone a minute." She would request witness to hold her hand and bind her head. She made exclamations of fright, and showed signs of fear. She would say, "Oh don't let him in here." She would ask witness to hold her tight; that she would complain of pain in her chest and head. She would say "Oh, Mrs. Miller, there is Cain again." She began to improve the latter part of November. Witness left her December 2, but she was still in bed. Witness expected to return, but took ill herself and could not. Plaintiff was sometimes uncontrollable. "She would rise up out of bed" and scream for witness to come and take hold of her, and

would make reference to defendant by name. Witness never met the plaintiff until she went to attend her. Witness said that in all of her experience she had never seen any one in plaintiff's condition—had never nursed any one as nervous as plaintiff.

Dr. Andrews, the physician who attended plaintiff, testified he had known her about 40 years, and was called to attend her about October 20, 1924. All of her symptoms were "symptoms of nervous shock, or shock at least. It is difficult to differentiate without a history between a nervous and traumatic shock. A traumatic shock is due to a force being applied—a blow external or internal. A nervous shock is a little more errotic, a little harder to deal with, and more persistent, more effect upon the body. It is difficult to say whether the nerve injury was permanent. It still persists at this time in a lessened degree." She was in bed six or eight weeks while witness attended her. Witness prescribed a nurse for her—Mrs. Miller. Witness saw plaintiff in June or the early summer of 1924. She seemed very active, in good condition and stouter than she had been, in good mental condition, and seemed to have much life. Witness noticed a change after July. She was in his office once or twice in August. She was nervous. He gave her a sedative—a little tonic that soothes the nerves—that was to overcome a nervous shock. She was quite bad when witness first saw her in October. That was why he prescribed a nurse. It was several weeks before she began to rally. She could not be controlled before she got the nurse. She appeared to have lost weight. She looked haggard and pale. She complained of considerable soreness in her stomach and chest at that time. Witness made an examination, but found no fracture. He could not take an X-ray unless she had gone to the hospital, and that seemed unnecessary. On further examination witness testified he found no organic trouble, and, so far as his knowledge went and his examination showed, she was fairly sound physically. He stated that a "shocked condition is not a normal condition,

but there is no disformity, and there is no change in the organ itself"; that he could determine the shocked condition without a history of the case; that there was an injury to the nervous system; that her condition was rather grave at certain times for several weeks. Witness meant those "profound symptoms that, when looking at the patient, a preliminary examination, you would suppose she might die at almost any time.  *  *  *  It was sufficient to keep one on the anxious seat regarding it." Witness then testified concerning his former acquaintance with plaintiff, and stated that she looked wholly well when he met her on the street and when he was first introduced to her husband, and many times after she seemed well and happy. She had been married three or four years, and appeared in better health than before.

It is unnecessary to state the evidence on the part of the defendant. It is sufficient to say he categorically denied every statement of plaintiff and her witnesses tending to prove the various assaults and forms of abuse alleged in her complaint. The question is, Can this court, from the evidence appearing in the record, find that the trial court abused its discretion in denying defendant's motion for a new trial?

In view of the present state of the law as declared by this court in previous cases, it is not satisfactorily established that a trial court may not, with the consent of the prevailing party, reduce the damages awarded and deny a new trial, even though the damages are excessive apparently as a result of passion or prejudice.

We have referred to Stephens Ranch Case, 48 Utah, 528, 161 P. 459 and the Jensen Case, 44 Utah, 100, 138 P. 1185, in which for the first time there appears to have been a philosophical discussion of the question. Prior to those cases the uniform holding of the court appears to have been against interfering with the verdict of a jury in a law case, whether the damages were excessive or not, and notwith-

standing they may have been the result of passion or prejudice. Upon this point see the following cases: *Budd* v. *Salt Lake City*, 23 Utah, 515, 65 P. 486, in which previous cases are collated at page 519; *Braegger* v. *Salt Lake City R. R. Co.*, 24 Utah, 391, 68 P. 140; *Palmquist* v. *M. & S. S. Co.*, 25 Utah, 257, 70 P. 994; *Burt* v. *Utah L. & P. Co.*, 26 Utah, 157, 72 P. 497; *Railroad* v. *Russell*, 27 Utah, 457, 76 P. 345; *Nichols* v. *O. S. L. R. R. Co.*, 28 Utah, 319, 78 P. 866; *Sargent* v. *Union Fuel Co.*, 37 Utah, 392, 108 P. 928.

In the foregoing cases and in the cases collated in 24 Utah, supra, the court invariably appeared to be of opinion that this court had no power to review the question as to whether or not the damages awarded by the jury were excessive. In some of the cases it was even held that the Constitution forbids it. The first departure from this view I have been able to find in the decisions of this court is in *Jensen* v. *Railroad Co.*, supra, in which, as before stated, there is a philosophical discussion, and some effect is attributed to the Code which authorizes a new trial where damages are excessive as a result of passion or prejudice. The next case in order is *Thomas* v. *Ogden Rapid Transit Co.*, 47 Utah, 595, 155 P. 436, which is in line with the Jensen Case, though not discussed to the same extent. The last is the *Stephens Ranch Case*, supra, which also discusses the question on principle, but, as before stated, the court was divided on the question we are now considering. There may be other cases which the writer has overlooked, but such as I have cited illustrate the present state of the law as determined by the court. I am of opinion the question is still open as to whether this court may review a question of this kind, unless it is manifestly clear as matter of law that the trial court has abused its discretion in denying a new trial. And upon that question it seems to me, in case of doubt, the deliberate action of the trial court should prevail. Otherwise this court will sooner or later find itself usurping the functions of both the jury and the trial court, in violation of the spirit, if not the letter, of the Constitution.

I am unable in the instant case to find any tangible support for the view that the trial court abused its discretion in making the order it did and in denying the defendant's motion for a new trial. That there is evidence in the record to sustain a verdict for damages no one will deny. The elements of damage entering into the case are set forth in the court's instruction No. 9, which reads as follows:

"The court instructs you that, if you find the issues in favor of the plaintiff, you should assess the amount of damages to which you think the plaintiff is entitled; and in assessing the same you should take into consideration the actual damage sustained by reason of the assault, in which is included the physical injury suffered, if any, the mental suffering, shock, and injury to the nervous system, humiliation, mortification, and injury to her feelings, and sensibilities resulting from such assaults, together with the disgrace, insult, and indignity to which the plaintiff was subjected by said assaults, and from which, if any, she now suffers, as well as the effects of such assaults upon her present health and the future condition thereof, and also its effects, all of which the court charges you are proper elements of damage to be considered by you in arriving at your verdict; and, if you further believe that said assault was wilfully, wantonly, or maliciously done, you may assess an additional sum as punitive or exemplary damages, as a punishment to defendant and to deter others from the commission of a like offense. Some of these elements of damages are not susceptible of measurement by any exact rule. They are therefore left to you to be determined from the evidence in the case in the light of your experience in the affairs of life which you have in common with all mankind, and in the exercise of your sound judgment and common sense."

Assuming that the damages awarded by the jury are excessive, what evidence is there that they were awarded under the influence of passion or prejudice? No exception was taken to the jury, or any member thereof, when they were impaneled, no conduct on their part, or any of them, evincing prejudice or passion, was noted during the progress of the trial, and no complaint is made whatever except as to the amount of the verdict. With all of the elements of damage to consider and pass upon, assume that the dam-

ages were excessive and too liberal, what evidence have we that it was anything more than an honest mistake of judgment as to what the damages should be, and what assurance is there that upon that question our judgment would be more accurate than that of the jury?

It is not my purpose to review and comment upon the evidence. The jury saw the litigants and the witnesses and how they appeared during the trial. So also did the trial court. They have passed upon the questions here involved, and, as I view the case, without stronger convictions than I possess at the present time, it would do violence to my own conscience and judgment to undertake to disturb the order made by the trial court. I cannot find that the jury was influenced either by passion or prejudice, or that the trial court abused its discretion in denying defendant's motion for a new trial.

The judgment is affirmed at appellant's cost.

GIDEON, C. J., and FRICK and CHERRY, JJ., concur.

STRAUP, J. I dissent.

Looking at the case in the light most favorable to the plaintiff, as I am required to do, and though it be assumed that there is sufficient evidence to support a verdict in favor of the plaintiff for some damages, nevertheless I cannot yield to a holding that there is sufficient evidence to support the amount of damages as rendered by the jury nor as diminished by the trial court. Because a record viewed in a light most favorable to a plaintiff may entitle him to some damages, it does not follow that the amount of a verdict as rendered is supported by sufficient evidence. It is from such considerations that I view the case. In doing so, I shall consider only such facts concerning which there is no conflict in the evidence, and, where there is a conflict, I shall consider only the evidence adduced on behalf of the plaintiff.

She was a married woman, 48 years of age, living with her husband. She was married to him in 1920. Some time

prior to April, 1923, the exact time is not shown, she or she and her husband entered into a contract to purchase the Kelvin Apartments for the sum of $11,000, on monthly payments of $135 each, subject to a mortgage of $17,500. She had no income other than as derived from rents of the apartments. Her husband had no income and no employment except about the apartments. In April, 1923, they were in default in making payments on the purchase price of the property, and by November 15, 1923, such defaults, taxes, and assessments due and unpaid amounted to about $2,000, about $10,000 yet to be paid on the purchase price, and the $17,500 mortgage still outstanding. The first time the Gearys met Cain was in October, 1923, when they borrowed $200 from him and gave him, as plaintiff testified, her contract of purchase for security. On November 15, 1923, because of defaults of the payments, a forfeiture of the contract was declared and a contract thereupon entered into between Cain and the owner of the property to purchase it, at which time the possession of the property was turned over to Cain by the Gearys and with their consent the tenants notified to pay the rent to him. At the same time the Gearys and Cain entered into an agreement whereby they agreed to pay him $40 a month for one of the apartments occupied by them, $25 of which was to be paid in labor in caring for the premises, and $15 in cash until further notice. At that time an action was pending between the Gearys and others, in which Cain in no manner was concerned, wherein such others obtained a money judgment against the Gearys or Mrs. Geary and on execution sold all right, title, and interest held by the Gearys or Mrs. Geary in and to the apartments. In proceedings had in such case, the plaintiff testified that she no longer had any interest in the premises and was only a caretaker of them for Cain. Later she, in the federal court, was adjudged a voluntary bankrupt. The Gearys, under their agreement of November 15, 1923, with Cain, continued as his tenants occupying one of the apartments, cared for the apartments, and collected

rents from other tenants and turned them over to Cain. On October 17, 1924, Cain, who up to that time had paid on the property something over $2,500, including back taxes, special assessments, and repairs, etc., offered to turn over to the Gearys his contract to purchase on payment to him of $2,500 within 30 days. The Gearys were unable to pay such sum or any sum. Later, and on December 5, 1924, Cain in writing again offered to give the Gearys a quitclaim of all his interests in the premises on payment to him in 30 days of the sum of $1,500; but the Gearys were unable to pay even such sum. In April, 1925, Cain commenced an action against the Gearys, and in June of the same year obtained a judgment against them for $255 for unpaid rents of the apartment occupied by them and for restitution of the premises. In that action it was alleged by the Gearys that Cain had purchased the apartments and held title thereto for the use and benefit of the Gearys, and that he account to them, but the court in such action held against the Gearys, and held that they had forfeited and surrendered whatever right, title, or interest they had in or to the premises, and that they no longer had any interest therein. Then in July, 1925, the plaintiff commenced this action against the defendant for alleged assaults committed on her by him, one on July 14, 1924, one August 10, 1924, one August 16, 1924, and the last on December 5, 1924. All through the course of her testimony in this case, the plaintiff, notwithstanding the prior adjudications against her and in direct conflict with her written agreement of November 15, 1923, admittedly entered into by her and her husband, forfeiting all their right in and to their contract of purchase and in and to the premises, and surrendering possession of them to the defendant, and of the undisputed relation between them of landlord and tenant as to the apartment occupied by them, berated the defendant for violating, as she claimed, a pretended agreement had with her to protect her interest in the property, to purchase and acquire it, not with money of the Gearys or anything of value furnished by them or

either of them, but with the defendant's own money, and to hold the title for her use and benefit; and, because of his failure and deception in such respect, as she testified, she lost all that she had put in the property, and from time to time had made numerous demands for a settlement with Cain in relation to such matters, but that he put her off, and finally refused to do anything, and, as she testified, "set her out in the street."

In addition to the matters set forth in the prevailing opinion as to the first alleged assault on July 14, 1924, the plaintiff further testified that, when she told the defendant she "would scream," she further testified that she at that time heard some one coming up the back way, she thought a man with paint buckets, and that there was a noise, and "I said, 'let loose or I'll scream' "; that her husband had just returned and was up in their apartment (she and Cain being in an apartment on the floor below), and when she, as she testified, broke loose from the defandant and ran up to her apartment where her husband was, who, as she testified, had just returned "from town or somewhere; he had just been out a little while and he had come back, and I took a hammer to Mr. Geary—they called for a hammer—and then I went back." She said nothing to her husband as to what had happened, made no complaint whatever to him, took the hammer to him, and then immediately went back to where Cain was, who, as she testified, had just a few moments before assaulted her in manner as detailed in the prevailing opinion. When asked why she had not screamed or called for help or complained to her husband, she but answered that she was fearful her husband would do violence to Cain; that Cain had all the papers; that she "wasn't a blabberer"; and that Cain threatened to take the apartments away from her and dispossess her though it indisputably was shown by her own instrument in writing, admittedly signed by her, that she, eight or nine months before, had forfeited whatever right, title, or interest she ever had in or to the apartments and

had surrendered possession thereof to Cain, and, too, whatever right, title, or interest she may have had in or to the apartments had been sold on execution sale in the case referred to.

I come now to the second alleged assault of August 10, 1924. On that occasion she testified she was indisposed, lying on her couch in her apartment, when Cain brought a couple, a man and wife, to look at an apartment and who wanted an unfurnished apartment; that plaintiff told Cain there was no unfurnished apartment and no place to store furniture; that Cain and Geary took the couple to an apartment across the hall from the apartment where plaintiff was lying, and, while Geary was showing the couple the apartment, Cain, with the doors of both apartments open, stepped up to the couch where the plaintiff was and stooped down, and "patted" her head and said to her, "You are not well again, little baby"; that she replied she would be all right in a day or two, that she was not feeling very well that day; that Cain thereupon put his hands on her breasts and "squeezed" her, and said, "You are going to do as I want you to, are you not?" and that she replied, "I have tried to do what is right, I have tried to please you," and that Cain said, "You know what I want; you will do it, won't you? You will come through; you will be mine. You please me, and I will do anything for you; you can stay here as long as you want; it will be your home, little baby; you won't have to worry and work like you do;" and that she replied, "Mr. Cain, put those people out down stairs; there will be people here tomorrow to take the place that is furnished; put the old couple down stairs out"; and that Cain said, "Anything you say goes," and at that left. Again she testified that she made no outcry or complaint, or that she even made any active resistance or objection.

The next assault testified to by her was October 16, 1924. On that occasion she testified Cain came to her apartment and asked where Geary was. She told him he was down town but would be back before long. Cain then

said that he did not care for Geary, but "you are all right, dear little baby; what are you worrying so for? Why do you worry?" that she replied, "On account I want a settlement; I want this contract to my home; I can't have peace until I know my home is safe," and at that Cain put his arms around her and said, "Are you ever going to do what I want you to? You won't need to worry like that if you do what I want you to," and then he "squezzed me and shook me"; and she said, "Mr. Cain, you must be honorable; let loose and go; some one is coming; Geary is coming and I'll scream." She further testified: That Geary was down the street and saw Cain run out of the house. That she didn't dare to tell Geary anything; that he would have killed Cain. That she was "in a heap on the floor when Geary arrived. I was crying, sobbing, and wringing my hands. He picked me up, and said 'What is the matter?' and I said, 'Mr. Cain has been here'." That Geary laid her on the bed. That she was not exactly unconscious "but went helpless. I knew what I was doing, but couldn't help myself. Every time I would get up I would fall over. Couldn't walk. My husband did whatever things to revive me, but from that time on every time I would get up and try to walk, especially when I tried to get up, I would go over; I would fall over." That she couldn't walk from her bedroom to the other room, and that the next morning when she tried to dress herself she fell to the floor. That her husband got the breakfast "and after that every time I tried to get up or walk or sit up I would go over with pain. It seemed like I was crushed. When I tried to eat, I couldn't choke it down. It hurt me here, through my back, and I was in bed two or three days and gradually got worse and called a doctor," who, as she said, examined her "body thoroughly all over and prescribed a tonic and some medicine," but that she made no complaint to the doctor as to any assault having been made on her nor did she attribute her condition to any such cause. Most remarkable, natural, and probable symptoms and consequences flowing from the

acts testified to, that the defendant called her his "little baby," told her not to worry, put his arms around her, told her if she would do what he wanted she need not worry, squeezed her, and, when she told him, "Geary is coming, go, I'll scream," Cain ran out of the house; and when her husband arrived and found her, as she testified, "in a heap on the floor, crying, sobbing, and wringing her hands" and in a helpless condition, and, on being asked what was the matter, the only reply made by her was, "Cain has been here;" yet from thence on she testified, she gradually grew worse, procured a nurse November 15, until December 2, 1924, when, as she testified, she had partially recovered, but was still confined to her bed.

I now come to the last scene of the drama, December 5, 1924, when plaintiff testified the last assault was made on her, and for which damages are claimed. Up to this time there was no witness who saw Cain, on any of his numerous visits to the apartments, every few days, either to receive rents collected by Gearys or on other matters concerning the premises, do or say anything out of the way. No complaint had been made by her to any one except as she testified that some time in November she, for the first time, told her husband and a friend, when both were present, of the prior assaults made on her by Cain and what he had said and done to her. Her friend saw a deputy county attorney, not any of the attorneys appearing for plaintiff in this case, who visited the plaintiff at her apartment. A deputy sheriff and his wife resided in one of the apartments. The plaintiff testified she had intended going to Brigham City with her brother for a rest, but before she went she wanted a settlement with Cain, an agreement with him just how much he would take for his interest in the apartments; that he had many times promised to give her an agreement, but had always held it off, and that she was anxious to know what he would take for his equity and expenses and money he had paid out on the place "that I might have the contract back again in my name"; that

she wanted Cain to give her such a writing before she went away and also to pay him some rent which she had collected.

So on the evening of December 5, 1924, at about 6 o'clock, the plaintiff got the wife of the deputy to call up Cain on the telephone to come to plaintiff's apartment. Cain responded to the message and came up; but before he came, at plaintiff's instance, the deputy sheriff with a gun and two other able-bodied men were secreted in the bathroom leading from the room where plaintiff was, but with the door of the bathroom sufficiently ajar so that those in the bathroom could see and hear all that took place when Cain arrived. The wife of one of the men was in the bedroom also adjoining the room where the plaintiff was. Plaintiff testified the men were secreted in the bathroom for her protection and the woman in the bedroom because she was tired and not feeling well; that Geary helped the plaintiff, she said she could not walk alone, from her bedroom on the couch where she reclined awaiting Cain's coming, and that her husband, knowing that Cain was coming and that the men were secreted in the bathroom then left the apartment, and, as plaintiff testified, went up town on business. At about 7 o'clock Cain arrived. The plaintiff, as she testified, opened the door and ushered him in. He took off his coat and hat. Her version of the affair from thence on is: That she told Cain she expected to go away for a few months, and to ease her mind she desired a settlement "on the business affairs of her home." That he said that was unnecessary; "Little baby, all will be well. When are you going to get rid of that silly old thing? Get rid of him. I'll take care of you. You don't need to worry like this. Lie down." And so she lay down on the couch, "as I was very weak; couldn't sit up long at a time"; and that Cain said, "You are weak, don't worry so much; I'll take care of you, you little baby;" and that she, in reply thereto, said, "I want you to give me a contract; I want you to write out something that my mind can be clear, that my

mind can be at rest and quiet," and that then he "petted me, squeezed my legs, and held me on the couch. I was dressed all but a dress; I had a kimona. I wanted something in writing, so he wrote out the papers that he would take $1,500 for his right and title. There was a great deal of talking. He kept petting me, trying to soothe me in a comforting way, coaxed me not to worry, told me to go away and rest, get rid of Geary, 'trust in me,' and he put his hand down my leg, and, by the way, I had an ice pick in my hand. I had it in my stocking but when I raised off the couch to get the piece of paper for Cain it dropped out of my stocking, and I picked it up, lay down again, gave him the tablet to write on, and put the pick by my side of the pillow behind me and he spied the end of it, and he wrote out his paper, and then just laid over around me like and says, 'What have you there? You have a pocket knife;' and asked to see it, and I told him he didn't want to see it, and then he reached and took it and said, 'Well, what are you going to do with that?' and I said 'I am kind of nervous when Geary is away. I am nervous and fretful, and I have that for protection.' Then he pulled the shield off and said, 'You wouldn't stick any one with that;' and I said, 'I am not sure about that if I had cause to;' and he said, 'Oh, don't use a thing like that, get a gun;' and he laughed, held the pick a while, and then put his arms around me and said, 'You wouldn't do anything like that;' and I said, 'I might if I had occasion to.' Then he laid the pick down on the couch and put his cap on and coat ready to go. I sat up by the table, showed him this paper, and he put his arm around me, and I sat on the couch, and he put his arm around me and drew me up close to him and said, 'I am glad to see you up; go and have a good time;' and then he squeezed and hugged me. This all occurred over a period of about a half an hour," and then Cain left. She further testified: That she did not call to the men in the bathroom for help, as on that occasion "I didn't need protection. I didn't call any one. The officers were there,

saw no violence or abuse as on previous occasions. I didn't call for help. Mr. Cain was very mild that night. The deputy sheriff didn't arrest Cain because there was nothing that night that required arrest; nothing like what occurred on July 14th and on October 16th."

The deputy was called by the plaintiff, and, as to what took place on the evening of December 5, testified: That he and two other men were in the bathroom with the door slightly ajar and watched Cain all the time he was there, and heard and saw all that took place. That Cain rang the bell; Mrs. Geary opened the door; Cain came in, asked how she was, and said something that she wanted to see him. That she replied she did, and that she wanted a settlement and wanted a contract as to what he would take for the apartments. Cain told her to sit down, that she need not worry about that, that will be taken care of. That Mrs. Geary said she was going away for a few days and wanted her mind put at rest, and that she wanted Cain to give her a writing as to what the settlement would be. She told Cain she was in a weak condition, and lay down on the couch, and that he moved his chair up closer and told her she was worrying too much about this affair, that she need not worry about it at all, that he would take care of her and to get rid of that "old fool, and it will be all right," and at that he laid his hand on her and upon her breasts and legs. She removed it, and Cain said, "You don't need to worry, get rid of that old fool," and she said, "You are a married man; you should not do these things; and then Mrs. Geary reached down on the floor and slipped something under the pillow. Cain said something about writing out the settlement. Mrs. Geary got a piece of paper for him, and he wrote out something and handed it to her and got up and went to the door. Then he looked down on the couch and said, "What is this?" and she pulled out the ice pick and said, "Well, I am afraid of you, Mr. Cain;" and he said, "You don't want to use a thing like this; if you are going to kill a man, get a gun;" and either handed the pick back

to Mrs. Geary or laid it on the table and left. The deputy further testified that he saw the plaintiff a number of times before this occasion; that she appeared to be in a weak condition; that she told him a number of things which he thought were "rather funny," and that, when she referred to the trial of her case in court, "I thought she was losing her mind, I didn't think she was right"; that he did not arrest Cain because he had done nothing to justify an arrest, and that he "thought possibly it might have been a frame-up," and that he wanted to be as careful as he could and "still be right," but "didn't think it was a frame-up." The testimony of one of the other men in the bathroom who also called by plaintiff, was, as to what took place between Cain and Mrs. Geary on that occasion, substantially as that given by the deputy. The other man in the bathroom was not called as a witness.

Such was the whole of her evidence as to the alleged assault on December 5th. The evidence respecting it carries its own brand. It shows either the conduct of a dement, fretting and worrying over financial matters and losses, or a "frame-up" in an attempt to procure evidence of an unworthy cause. I think the performance as described by plaintiff and her witnesses may not be otherwise characterized. It was not shown that any assault was committed that night, so far as testified to by plaintiff herself, for, according to her testimony, she neither resisted, remonstrated, nor objected, but seemingly acquiesced in what Cain on that occasion said and did, and testified that "Cain was very mild that night" and "petted and tried to soothe and comfort" her; and, according to the testimony of the deputy, Cain but laid his hand on her and on her breasts and legs, which she removed, saying he was married man and should not do those things—naughty boy—but gave no testimony that the plaintiff otherwise objected or resisted, and at most what Cain then did, if not a procured or an induced, was but a bare technical assault, or no assault, because acquiesced in if not encouraged by her.

The plaintiff further testified that, covering the period in which the alleged assaults were made and thereafter until some time in March, 1925, Cain, except a few weeks when he was out of town, frequently, every few days, called at the apartments and conversed and had dealings with the Gearys in receiving the rents and other matters concerning the apartments, and that the relation between them was friendly, and that at no time and on no occasion, prior to the commencement of this action, had she in his presence accused him of or mentioned any assault made upon her or that he on any occasion in any particular had mistreated her.

She further testified that in 1923, shortly after she moved in the premises and before she had known Cain, she had a miscarriage and was ill for three or four weeks; that in December, 1923, she suffered from hemmorrhoids and was operated on at a hospital; that some years before she suffered from neuritis and was in a hospital for three months; and that she also suffered from rheumatism.

I think it clearly shown that the plaintiff, prior to her meeting Cain, was frail and sickly, and that her claimed neuresthenic condition was largely, if not wholly, due to worry and fretting over financial losses and losing the apartments, due solely to her inability to keep up her contract in the first instance resulting in a forfeiture of it, a sale on execution of whatever right, title, and interest she had in and to the apartments, and her total inability to pay Cain anything for moneys himself put in the apartments, though willing as he was, yet under no obligation whatever, to turn over to her all right he had in the apartments, if she but partially reimbursed him.

The circumstances described by her under which the first assault was committed, that she broke loose from the defendant's embraces and ran up stairs where her husband was, taking a hammer to him, saying nothing to him or to any one as to what had occurred, immediately leaving her apartment and going back where Cain was, thereafter re-

maining friendly with him, stating to him that her worries and fretfulness were due to the loss of what she called her home and of her desire to get some writing from Cain to protect or secure her rights therein, not making any claim that her condition was due to any assault or similar mistreatment, and manifesting no displeasure of him until the threatened proceedings to evict her, render her testimony as to such assault, especially as to the seriousness of it, improbable if not unbelievable. So too as to the second assault, when her husband and the couple to whom he was showing an apartment were just across the hall a few feet away, with both doors open, when as she said the defendant patted her head, squeezed her breasts, called her his little baby, and said that she was going to do what he wanted, and that she, without even a remonstrance, but replied that she had tried to do what was right and to please him, and told him how it could be arranged to accommodate the couple seeking an apartment. It is inconceivable how any assault of a serious nature, anything but a technical assault, may be deduced from testimony of such character. Strange it is that the plaintiff should so suddenly and so completely be prostrated from the third assault, when it was no more serious than the second, and, as described by her, less serious than the first. Strange too is it that, if it be true that because of the assault the plaintiff fell "in a heap," crying, sobbing, wringing her hands, was rendered helpless, could not walk, and when her husband arrived as the defendant ran out of the house and asked her what was the matter she but replied, "Cain has been here"; but that nothing further was asked by him and nothing further told him, though the next day and for weeks thereafter she, as she testified, fell over whenever she got up and attempted to walk, and was confined to her bed, and that, when the doctor finally was called, she in no particular then attributed her condition to any such cause as now claimed. And more strange too is it how such a condition as described by her could as any sort of reasonable,

natural, or probable consequence be attributed to the acts constituting the assault as described; the defendant calling her his little baby, telling her she need not worry if she did what he wanted, putting his arms around her, and squeezing her and running from the house on her telling him to let loose and go, that her husband was coming, and that she would scream. On that occasion she testified that when Cain came, on entering her apartment and after greeting her, he asked her, "What are you worrying so for? Why do you worry?" she replied, not because of any assaults, but because she wanted a settlement, "a contract to my home," and that she could have no peace until she knew her home was safe. And, if it be true that as Cain left she was prostrated, crying and sobbing, it is more likely that such mental state was due to Cain's then refusal or failure to comply with her request.

Little more need be said as to the circumstances of the claimed last assault. If it be true that plaintiff then was in such condition as to be unable to walk and had to be assisted from one room to another, it is inconceivable that any present assault of any serious nature was then attempted. Neither plaintiff's testimony nor that of her witnesses shows that any assault was then made, unless a bare technical, if not an induced, assault. Two views may be taken as to the laid plan or scheme inviting the defendant on that occasion to plaintiff's apartment. One to invite or induce him to take liberties with the plaintiff or at least to create an opportunity for him to do so in the hope that, with the bathroom full of witnesses, he would do so, and the more violent or aggravated the liberties might be, the better the desired object of the invitation would be accomplished. The other view is that the plaintiff desired to arrange an interview with the defendant to obtain admissions or promises from him in the hearing of others with respect to some sort of an acknowledgment on his part as to her rights in and to the apartments. Certain it is that the deputy sheriff and two other able-bodied men were not

secreted in the bathroom for plaintiff's protection, and the wife of one of the men in the bedroom because she was tired and not feeling well, when just below she had an apartment of her own, and that the claimed presence of the secreted witnesses for protection was but a pretense so flagrant as to cast doubt and suspicion on the bona fides of the whole transaction. If plaintiff, before she went away as she said she contemplated doing, but desired to pay Cain some rent which she had collected and was fearful that he might assault her—when she was not even able to walk or sit up long at a time—surely her husband could have taken the rent to Cain or remained at the apartment when Cain came, or any one of the men secreted in the bathroom, or even the woman in the bedroom, could have been present in plaintiff's room when Cain came. When he arrived and inquired of plaintiff the purpose of the visit, she told him she expected to go away a few months "and desired a settlement so that my mind would be at ease on the business affairs of my home," and before Cain left he gave her a writing quitclaiming to her all his right, title, and interest in and to the apartments on payment to him in 30 days of $1,500.

Neither the plaintiff nor her husband having any source of income whatever, it is inconceivable how they, though they in some manner had been able to raise the $1,500, could have met the unpaid purchase price of the property then amounting to nearly $10,000 and take care of the $17,500 outstanding mortgage, unless Cain, for plaintiff's use and benefit, himself with his own money took care of and discharged such obligations and without reimbursement turned the property over to her, which, of course, he refused to do. And, when Cain finally ousted the Gearys from the apartment occupied by them for nonpayment of rent, this action, in about a month thereafter, was commenced. And there is the peak of this controversy.

In giving her testimony, answers in many particulars made by her to questions propounded to her were irre-

sponsive and evasive and sometimes were mere addresses or arguments to the jury. So, too, in instances, her testimony on material matters was in direct conflict with her deposition taken before the trial. And, as already observed, the assaults as described by her were not of such serious consequences as to justify any such verdict as rendered by the jury nor as diminished by the court. That the verdict as rendered was so grossly disproportionate to all reasonable and probable consequences attributable to the assaults as described by the plaintiff and the circumstances under which they were committed as to indicate that the verdict was the result of passion and prejudice, and not from a fair or impartial consideration of the law and the evidence, may not well be doubted. The trial court evidently was of that opinion when it ordered a new trial unless the plaintiff remitted $10,000 from the verdict. I do not contend that the trial court in no case, where he is of opinion that the verdict was the result of passion or prejudice, may not require a remission and if not made grant a new trial. Under holdings of this court I concede that may be done in some cases, and I too readily concede that to a large extent such matters rest within the sound discretion of the trial court. Nevertheless a ruling resulting from the exercise of the discretion is not final nor unreviewable. Whether a ruling in such respect was or was not proper or justified in the exercise of a sound discretion must depend upon the peculiar facts and circumstances of the case. Where a verdict is not merely excessive, but is so grossly and palpably disproportionate to all reasonable, natural and probable consequences attributable to the alleged acts as testified to and described, and where the testimony with respect thereto is doubtful or improbable or induced by ulterior motives, and where the verdict is attributable not to a fair and impartial consideration of the law and the evidence bearing on the material issues, but to an abuse in the rendition of it, resulting alone from passion and prejudice, the whole verdict is so tainted that to deny a new trial upon a re-

mission constitutes an abuse of discretion, for in such case the verdict is no verdict, and the amount fixed by the court but an arbitrary amount, and in effect a denial to a defendant of a trial by a jury on a consideration of only the law and the evidence in the case.

I thus think the judgment should be reversed and the cause remanded for a new trial.