**BARNARD KILGORE v. ELVA KILGORE, by her next friend and father, C. J. COLE.**

19 So. (2nd) 305                                  June Term, 1944
September 22, 1944                                        En Banc
Rehearing denied October 17, 1944

*Erle B. Askew, McMullen, McMullen & Pogue, Harry L. Thompson, S. Whitehurst's Sons, Clair A. Davis* and *Richard E. Earle,* for appellant.

*Anna A. Krivitsky, Howard E. Joseph, Walter G. Ramseur,* and *J. Lewis Hall,* for appellee.

ADAMS, J.:

Elva Kilgore sued her husband's father, Barnard Kilgore, for the alienation of her husband's affections. The jury awarded a verdict of $20,000.00. On motion for a new trial, the trial judge held that the evidence sustained the verdict and commented that for him to disturb the verdict would amount to a usurpation of authority.

Four principal questions are presented by this appeal: (1) The sufficiency of the testimony; (2) admission into evi-

dence of a letter, over defendant's objection, dated September 15, 1922; (3) the admissibility of statements to plaintiff by her husband; (4) excesiveness of the verdict.

Actions of this character are not altogether new in our State. Brandt v. Brandt, 138 Fla. 243, 189 So. 275; Clark v. Orr, 127 Fla. 411, 173 So. 155. One of the leading cases in this country is that of Wallace v. Wallace, 85 Mont. 492, 279 Pac. 375, 66 A.L.R. 587. This case also treats the several questions raised on this appeal. To sustain her case the plaintiff is required to prove: 1. The wrongful act of the defendant; 2. The loss of affection; 3. The loss of affection resulting from defendant's wrongful act. In a suit against a parent for the loss of affection the first element, namely, the wrongful act, is not proven until malice is shown. Moir v. Moir, 181 Iowa 1005, 165 N.W. 225; Meek v. Meek, 118 Kan. 106, 233 Pac. 1032; Kadow v. Kadow, 195 Wis. 650, 219 N.W. 275; Birchfield v. Birchfield, 29 N.M. 19, 217 Pac. 616. The parent is always justified in interesting himself in the children's welfare, even after marriage, but in so doing he must act upon good cause and be actuated by good motive, otherwise his conduct may become, in law, wrongful and malicious. Malice, as here used, does not necessarily spring from a mean or hateful mind or revengeful disposition. It implies conduct arising without justification in law or without due regard for the rights of the other spouse. Proof of such malice need not be by direct evidence. So far as direct evidence is concerned perhaps no one except the alienated spouse can actually say that he was influenced by the defendant's conduct and under the circumstances of the case he would hardly be expected to do so. And, too, the parental tie is so strong that the alienated spouse may be wholly unaware that his parent is actually weaning him away from his wife. The wrong may be perpetrated over a time and in such fashion that it would be utterly impossible to fix a time, place, deed or word to establish its proof by direct evidence. Frequently evidence of the wrong does not appeal until the deed has been accomplished. It is for the jury to say from all the circumstances whether malice in law has been proven.

The plaintiff was married to defendant's son, Chester

Kilgore, in 1922. Chester was employed by his father. When they had been married about two weeks the young couple went to Clearwater, some distance from Frostproof, where he was employed. After two days' visit defendant directed that Chester return to his work and leave plaintiff in Clearwater, saying, "Elva can't go with you; she interferes with your work." In this fashion the young couple started out and much of their life thereafter proceeded in somewhat similar manner until December, 1938, when Chester, after meeting with his father, returned and said in substance to plaintiff, "Dad has fired me . . . Elva, you and I are finished. . . . That is what Dad wanted . . . I am going down to the grove where I can think." Thereafter the parties did not live together. Chester went away and communicated with his father. Plaintiff inquired of defendant of Chester's whereabouts and welfare and was assured by defendant that he was all right and doing nicely without her. Defendant only allowed plaintiff to communicate with Chester through his (defendant's) attorney. During the years Chester worked mostly for his father, there were several separations and several times Chester became involved in the law and became a fugitive. Once Chester was away and became ill with tuberculosis and defendant gave plaintiff transportation and requested that she go and care for him. She nursed him back to health. Thereafter, Chester injured himself severely and plaintiff continued to care for him. She said Chester was kind and devoted to her and they were happy together except when defendant was present.

Plaintiff admits defendant provided in a material way for wants of her and Chester but says that in return he completely dominated Chester's will. Defendant was no doubt actuated by what he thought to be a good motive and for the best interest of the parties, yet in his zeal to exercise his own will he purported to set himself up as a judge as to whether the marriage relation should continue. Shortly after the marriage, defendant advised a divorce because plaintiff was ill, or claimed to be, and for that reason, in his opinion, she would not make a good wife. This same advice was again offered after the final separation and while Chester

was absent. At the time defendant persisted in taking plaintiff to his attorney for the purpose of securing a divorce. Even though defendant was actuated in giving such advice by what he thought to be good motive, his advice was in such total disregard of the marital vows and the general concept of right we think the jury might well have concluded that his motive was unlawful. A parent who presumes to terminate the marital status of his child does so at his peril and should proceed with caution and reserve.

The evidence is voluminous and we shall not attempt to recite it in detail. For the purpose of disposing of this question we view it in its most favorable light to the plaintiff. The jury was authorized in believing her if they saw fit. She said that defendant, a rich man, threatened to disinherit Chester unless he divorced her and shortly thereafter Chester went away for a long period of time and that she was unable to locate him and only learned of his welfare through defendant. Plaintiff said defendant never approved of her and at all times blamed her for Chester's faults, which, admittedly, were numerous but existed prior to meeting plaintiff.

It appears by the record that the trial court submitted to the jury, under appropriate instructions, the issues made by the many allegations of Count No. 10 of the declaration and the pleas of the defendant directed thereto. One of the allegations of Count No. 10, in effect, is that Elva Cole and Chester Kilgore, son of Barnard Kilgore, married during February, 1922, and that they lived together as husband and wife until sometime in the latter part of 1938, with the exception of certain periods during their marital life when the plaintiff's said husband would desert her and would in turn finally come home and resume with her their marital relationship; and that during all of said period of such married relationship and more particularly immediately prior to the last desertion by the said Chester W. Kilgore about two years ago, the defendant contriving, wilfully, knowingly, wrongfully, unjustly, wickedly and maliciously to injure, prejudice and aggrieve the plaintiff in her enjoyment of the companionship, aid, society, comfort, and protection derived from her aforesaid husband, within

·the County of Pinellas, State of Florida, and divers other places, did wilfully destroy and alienate the affections of her husband, Chester W. Kilgore.

Admitted into evidence for the consideration of the jury, and over proper objections seasonably made by counsel for defendant below, was a letter dated September 15, 1922, allegedly written by the defendant which is viz:

"Clearwater, Florida, Sept. 15   22

"Hello Elva:

"Your telegram to Elsie arrived in answer to hers that went three days before and not until a message from somewhere up there arrived here instructing the Sheriff to hold him for the arrival of the warrant that your very amiable relatives seem to have been responsible for the issue of.

"He is now a fugitive from justice, and if you get your just deserts you would never have the opportunity of looking at him again.

"Don't think that I am condoling or overlooking his faults at all, but you *knew* that he has a very weak point and when he was trying hard to square himself, and was making fair progress, you must break it all up, even tho'h the means employed was as low and mean as he or anybody else could employ. And despite all of this his whole tho't is of you and how you are getting along and thinking that your amiable? people will try to alienate you from him—

"If you could have seen him when he got here I think it would have made an impression that would have left your common sense where it could be of use.

"I told him it would not be best for you to come back here until things have made a decided change, in fact, if I am not convinced beyond doubt, that you as well as he have absolutely changed your ideas of propriety, I shall favor his *permanent* abode in South America.

"I shall not think much of your reform or influence unless you succeed in getting your influential relatives to have those criminal warrants for him cancelled, and when I am convinced that nothing even a sick wife and her taunting relatives could induce him to write another bad check, I will

arrange to take up, or pay the people injured and take it out of something that would otherwise belong to Chester. And I think from the way he looked and talked that what he is going through will pretty soon fix him.

"If you think I am a little strong in my attitude, it is justified by the seriousness of the situation, and if the material trend is not corrected there will be a blemish on you for life and yours for several lives. Your present unhappiness or comfort is of no importance at all, compared with what you are coming to, so I am warning you that it is time to do what you can.

"Most sincerely
Barnard."

It was contended in the lower court, and here, that the letter, *supra,* was inadmissible into evidence because: (1) it was irrelevant; (2) if admitted to show malice, then it was too remote in point of time; (3) it was prejudicial; and (4) it was not a part of the *res gestae.* The authorities cited to sustain these objections have been carefully examined and considered. Our study of the record leads to the conclusion that the legal sufficiency of the allegations of Count 10, *supra,* under which the letter was received into evidence, was not challenged by demurrer or other steps taken to expunge these allegations at any time prior to pleading thereto. The trial court, as shown by the record, was not given an opportunity to rule upon the legal sufficiency of the allegations which authorized the introduction into evidence of the challenged letter. Other phases of this litigation have been previously considered here. See Kilgore v. Bird, 149 Fla. 570, 6 So. (2nd) 541.

It is established law that in order to sustain an action for alienation of affections against a parent, it must be made to appear that the parent acted maliciously, without justification, and from unworthy motives, and the burden of this proof by law rests upon the plaintiff. The letter, *supra,* while standing alone and as an isolated or uncorroborated transaction, may not be legally admissible. The record here reflects that the challenged letter is but a link in the chain of

numerous events reflecting malice toward the plaintiff by the defendant beginning shortly after her marriage.

Some of the other links in the chain relied upon to establish malice are statements of appellee, in substance, viz:

(1) After marriage I went with my husband to Frostproof where he was at work. We visited at Clearwater about two weeks later and defendant came over and demanded that Chester go back to work at Frostproof and stated, "Elva can't go with you, she interferes with your work." He went back without me.

(2) Chester and I moved from an old barn-like house on one of his groves and in the house with my mother. Defendant came out and demanded to know what business we had to move from the home he had selected for us.

(3) Sometime thereafter we decided to go to Illinois (where I was raised) and left Clearwater in a car. We reached Madison, Florida, and Chester was arrested on a warrant issued by the defendant on the charge of taking the car out of the County. Chester spent the night in jail at Madison. The defendant came to Madison and blamed me (plaintiff) for inducing Chester to leave Clearwater for Illinois. He told Chester, 'If she wants to go North so bad, just put her on the train, but you can't go, you come back (to Clearwater) with me."

(4) Chester wrote some worthless checks (which I knew nothing about) and criminal process had issued for his arrest. The defendant hid Chester so that he could not be arrested, and the defendant blamed me with causing Chester to write the checks.

(5) We were living at Fort Myers and Chester gave a bad check for an automobile. He bought the car at Fort Myers and rode in it to Tampa and left it there—so his father would know nothing about it. The defendant learned about it and came to me and said, "Well, there you go getting Chester to buy things he can't afford, and inducing him to write worthless checks; you are not fit to be his wife. I am going to do everything in my power for him to leave you." I knew nothing about Chester giving the bad check. Chester then disappeared and I did not see him for twenty months.

(6) During the twenty months I went many times to the defendant and asked him about Chester and where he was— the defendant told me "it was none of my business and he was getting along nicely without me."

(7) The defendant came to me and told me that Chester was a very sick man at Brownsville, Texas, and needed me. The defendant said, "But before you go there—you have got to go under an assumed name—and something more, when you write to your people, it will be through me, and when they answer it will be through me too."

(8) Chester came home one day in 1930 or 1931, with a large sum of money. I went to the defendant about it, as I had been blamed by him for all bad checks given by Chester, and the defendant told me that he "gave it to Chester to entertain the Green Fruit Inspectors." And he said, "that I didn't have any business going along with him; that I didn't realize what social life was. I was inferior to Chester."

Appearing in the record is testmony similar to the above quoted portions, beginning shortly after the date of marriage and is continuous and culminates in the separation of the husband and wife (plaintiff) during December, 1938. The period of alienation is shown to be continuous for some 16 or 17 years. Many of the cited cases disclose the existence of the alienation period for only some two or three years. In Monen v. Monen, 64 So. D. 581, 269 N. W. 85, 108 A.L.R. 404, the period of alienation is aproximately six years. See note 108 A.L.R. 408-429.

The rule is stated by 27 Am. Jur. 169, par. 566, thusly:

". . . To sustain an action against a parent for alienation of affections, it must appear that the parent acted maliciously, without justification, and from unworthy motives; the burden of proof of malice is on the plaintiff, and as a general rule to justify a verdict against a parent, there should be much stronger evidence of improper motives in the defendant than where the action is against a stranger. Nevertheless, alienation of affections by, and malice of, a parent may be inferred from and established by circumstantial evidence of wrongful and unjustifiable conduct of the parent. Evidence that parents actively interfered maliciously to cause

separation of the spouses, loss of affection, and consortium suffices to take the case of the jury and to sustain a verdict for the plaintiff. . . ."

The case of Puth v. Zimbleman, 99 Ia. 641, 68 N.W. 895, involved the admissibility of letters in an alienation suit. The action for alienation is a continuing one, it was suggested; that it goes on from day to day and generally growing worse with time. It is proper to show the feelings of the parties betwen each other during the whole period of alienation. See Wigmore on Evidence, Vol. 6 (3rd ed.) pp 93-98, pars. 1730-1731; 30 C.J. 1134-1145, pars. 1002-1022.

The appellant (defendant below) testified as a witness before the jury and gave his version of the several alleged clashes over the years between the plaintiff and himself. In all the testimony we observe disputes and conflicts. Events are recited which are calculated to establish a reconciliation between daughter-in-law and father-in-law; such as the father-in-law purchasing for his son and his wife a nice modern home at Clearwater; the plaintiff was a welcomed guest at all reunions of the Kilgore family; that she was recognized and appreciated as a member of the Kilgore family in the distribution of gifts from time to time. It was within the province of a jury, under appropriate instructions from the trial court, to decide under our legal system these many disputes and conflicts in the testimony. These functions under our organic law are conferred upon juries and courts are not permitted to interfere.

The third question relates to the admissibility of the above quoted statements made at the time of the final separation. The statements were objected to as hearsay. The trial court admitted the statements but instructed the jury that the statements should be considered as:

". . . bearing upon the question of Mr. Chester Kilgore's attitude, and it is hearsay insofar as Mr. Barnard Kilgore is concerned and should be so considered by you as only bearing upon Chester Kilgore's frame of mind with regard to the plaintiff in this suit. The statements as against Barnard Kilgore are hearsay and are not to be considered as evidence against him."

There was no error in this ruling. The statements were admissible to prove the third element of the cause of action, namely, the causal connection. See Sec. 1730, Wigmore on Evidence; Melcher v. Melcher, 102 Neb. 790, 169 N.W. 720, 4 A.L.R. 492, and note, 4 A.L.R. 505, et seq.

As to the remaining question on the excesiveness of the verdict we can only say that this was a jury question settled by them and approved by the presiding judge. It would be difficult indeed for us to substitute our opinion for that of the jury if we were authorized in doing so. The jury is allowed a wide latitude in the exercise of their judgment. In addition to support, a wife is entitled to the aid, protection, affection and society of her husband. Also, she may recover for any humiliation befalling her because of the desertion. The jury may award punitive damages by way of punishment for defendant's wrong. In fixing such award the jury may take into consideration the wealth or financial ability of the defendant. In this case defendant is worth over a million dollars, and in Wallace v. Wallace, supra, the defendant was worth only one-fourth of that sum and a verdict of $20,000.00 was not held excessive.

Viewing the entire evidence we fail to find error in the order of the trial judge in denying the motion for a new trial on the sufficiency of the evidence.

From a consideration of the entire record we find the judgment without error and the same is affirmed.

CHAPMAN, THOMAS and SEBRING, JJ., concur.

BUFORD, C. J., and TERRELL, J., dissent.

BROWN, J., dissents in part.

BUFORD, C. J., dissenting:

I am unable to concur with the conclusion reached by Mr. Justice ADAMS.

I think the letter of September 15, 1922, was not admissible in evidence for several reasons: (1) it was a letter from defendant to plaintiff written some sixteen years before the separation; (2) there is no evidence that its contents were ever made known to the allegedly alienated spouse; (3)

plaintiff's own testimony shows that her spouse was a loving and loyal husband for many years after the date of that letter.

It also appears to me that the testimony of plaintiff as to a statement made by her spouse to her on the 10th day of December, 1938, viz:

"He said—Dad has fired me—he said Elva you and I are finished—He said that is what Dad always wanted. He said I am going down to the grove where I can think.", was inadmissible and its admission constituted reversible error because the alleged statement was so vague, indefinite and uncertain as not to be susceptible of any certain meaning. What was it "Dad always wanted"? Was it to sever his connection with Chester in the affairs of his business: Was it to put Chester on his own: What did "Elva, you and I are finished" mean? Did it mean "We must find another place?" "We must go on from here, you and I together, without Dad's support and help"? Only God knows what that statement meant and the admitting of it in evidence was prejudicial to the defendant.

To me the evidence on the whole is entirely unconvincing. It shows that the defendant was a positive and, we may say, a domineering personality, but there is nothing in it which indicates that he entertained any thought of doing anything contrary to the best interest of his son, plaintiff's spouse, although that son had many, many times indulged in conduct which his father did not approve but unquestionably condemned. Conduct which not only aroused the just indignation of his father but also violated the law of the land. The evidence is convincing that long before the spouse (defendant's son) abandoned plaintiff the spouse was intimately associating with another woman. That of this association the defendant had no knowledge but of which the plaintiff was advised because she had surprised her spouse and this other woman indulging in (to say the least) a private liquor drinking bout in the hotel bedroom of the spouse.

The record shows that within ten days after plaintiff's husband left and abandoned her, he contracted a bigamous marriage (without his father's consent, connivance or

knowledge) with this other woman. So, as I see the record, there is the party responsible for the alienation of affection. Nowhere in this record is there any evidence of any cooling of the lover's ardor, any lack of affection or of the demonstration thereof of the spouse toward plaintiff until after this other woman began to play a part in the husband's life and doings. That the defendant was a well wisher to or that he had any knowledge of this unholy alliance between his son and this other woman is not intimated by the plaintiff or any other witness.

The evidence is convincing that Barnard Kilgore was not pleased by his son's marriage to plaintiff, but it also shows that he never was the activating force which alienated the affection of the son from the plaintiff. Her testimony shows that her husband was affectionate and considerate of her until after the beginning of his association with that other woman of whom he became so enamored that he, within ten days after leaving his wife, indulged in a bigamous marriage.

The judgment should be reversed.

BROWN, J., dissenting in part:

I concur with the majority that there was sufficient evidence introduced to require the trial court to submit this case to the jury and also in the holding that there were no errors in the rulings of the trial judge during the progress of the trial or in his charge to the jury, but in view of all the circumstances revealed by the evidence I think the verdict of the jury was excessive and that a remittitur of one half the amount of the verdict should be required.