267 P.2d 759

## WILSON v. OLDROYD.

### No. 7969.

Supreme Court of Utah.

March 3, 1954.

George W. Worthen, Provo, Arnold Roylance, Springville, Pugsley, Hayes & Rampton, Salt Lake City, for appellant.

Christenson & Christenson, Provo, for respondent.

CROCKETT, Justice.

Dale Berkeley Wilson recovered judgment of $50,000 compensatory and $25,000 punitive damages against Dr. Merrill L. Oldroyd for alienation of the affections of plaintiff's wife. The jury found against defendant on his counterclaim for slander, but allowed him $719 for medical services rendered to plaintiff's family which is an offset against the judgment.

Errors assigned: (A) Denial of defendant's motion to dismiss the complaint as insufficient; (B) refusal to grant a directed verdict; (C) refusal to set the verdict aside as excessive; (D) submission to the jury of the question of punitive damages; (E) admission of testimony concerning defendant's wealth; (F) exclusion of certain evidence; and (G) errors in the instructions.

■ Before addressing our attention to the errors just recited, which we will do in the order listed, a brief summary of the essential facts, viewed in the light most favorable to the plaintiff [1] is in order.

Dale Wilson and his wife Geraldine had married in 1939; they lived in Payson, Utah with their two children; Mr. Wilson had worked for the past six years in the Veterans "On Farm" Training Program set up by the State Department of Education. Dr. Merrill Oldroyd was a friend and physician to the Wilson family. Plaintiff's testimony, corroborated by other witnesses, described the marriage as a happy one until the "affair" with Dr. Oldroyd of which we will hear more later. In the fall of 1950, Geraldine, who had been trained as a nurse and had worked at the Payson Hospital on previous occasions, was working there during the vacation of one of the other nurses. She later informed her husband that she thought she would stay on, and although he wanted her to quit, he reluctantly consented to her wishes. During that time he became aware of the fact that his wife and Dr. Oldroyd of the hospital staff had more than a friendly interest in each other. He noted a definite change in his wife's attitude; she became irritable in the home, and showed no affection, but was, in fact, frigid toward him. Upon inquiry about the matter Dr. Oldroyd, and also Geraldine, informed him that she needed an abdominal operation which Mr. Wilson thought might explain her irritability and attitude, so he consented. She continued to work until the 2nd of January, 1951, when she was operated upon. Although it was later learned that at least a meretricious flirtation had been going on between Geraldine and Dr. Oldroyd, an occurrence of that morning was the first definite evidence Mr. Wilson had of it. As he entered the room the doctor was at his wife's bedside; he heard Geraldine say to the doctor, "Oh honey, you like red lips and curly hair" and the doctor's face was smeared with lipstick.

1. Gibbs v. Blue Cab, Inc., Utah, 249 P.2d 213, affirmed, Utah, 259 P.2d 294.

A day or two later Mr. Wilson went to the doctor and importuned him to stop interfering with his home. The doctor denied any improper conduct and assured Dale Wilson that he was his best friend. Dale, however, warned the doctor that he intended to protect his home by every means he could. Early in January, Geraldine told Dale she loved Dr. Oldroyd. Sensing that the situation had not changed, about January 19th Dale again visited the defendant in the latter's office and pled with him to leave his wife alone, referring to a letter the doctor had written to Geraldine. The doctor denied writing it and only admitted it the next evening when Dale met with him and Mrs. Oldroyd and produced the letter in the doctor's own handwriting addressed to Geraldine Wilson, who had then gone to her father's home in Riverside, California. The letter reveals much more than the platonic interest Dr. Oldroyd professed for Geraldine. It was filled with terms of love and endearment, beginning: "Geraldine Sweetheart:—If ever I need you it's to-night" and concluding "Remember my dear —all the times I've told you I love you. I still do a thousand fold—believe me—Write often sweetheart to your humble servant— the one who cares." The return address was to a third party, evidently so that if the letter were returned it would not fall into the hands of the doctor's wife.

Dale exacted a promise from the doctor to write another letter to Geraldine advising her to go back to her husband, which the doctor in fact wrote. Geraldine returned to Payson, and discussed the discovered love affair with Dale, and on January 31st a "final" meeting between Geraldine and the doctor was arranged, ostensibly for the purpose of discontinuing their relationship. Mrs. Oldroyd was an unobserved witness to this meeting. It lasted for about 3 hours during which she saw the couple embracing and kissing each other. The relationship did not end following this meeting; the doctor and Geraldine had later meetings in Salt Lake and Las Vegas, Nevada, and continued to correspond through intermediaries, each agreeing to destroy the letters upon receipt. In his deposition, defendant admitted that he had kissed Geraldine as early as November, and an indefinite number of times since, and that by the fore part of December he had told her he loved her. He also stated to his own wife that he desired to help Geraldine financially, but that he could not do so as long as she was Dale's wife. The doctor called his own wife to testify for him on the counterclaim for slander. On cross-examination she admitted that she knew of her husband's romance with Mrs. Wilson; that on the occasion of the last Las Vegas meeting between her husband and Geraldine she had not known of his whereabouts until tipped off by Dale; that her husband had made it a point to call her the next day from Sun Valley, Idaho, to allay any suspicions of the Las Vegas trip; that she had given considerable thought to trying to break up the affair with Geraldine which she averred had continued up to the

time of the present trial. The marital difficulties of the Wilsons resulted in a divorce and subsequently this suit was prosecuted.

■ A. The complaint contains the essential allegations of a cause of action for alienation of affections: (a) The fact of marriage, (b) that the defendant wilfully and intentionally, (c) alienated the wife's affections, (d) resulting in the loss of the comfort, society and consortium of the wife, and (e) (to justify punitive damages) a charge of malice. Particularly under our new Rules of Civil Procedure [2] a statement of the ultimate facts is sufficient and it is unnecessary to set forth in detail the conduct, the language or the artifices used to accomplish the result.

■ B. As to the directed verdict: In addition to the general charge that the evidence failed to make out the elements of the cause of action just referred to, the defendant added two contentions: First, that Mr. Wilson had already lost the affections of his wife, so there was nothing left for him to alienate; and Second, that his conduct with Mrs. Wilson, although admittedly indiscreet and somewhat below the standard of rectitude that properly could be expected of him, was but a transitory flirtation which would have subsided in due time, and thus would not have constituted a deprivation of the plaintiff of his wife's affections. A full answer to this is to be found in the fact that the evidence was conflicting on these matters. Each of these theories was properly submitted to the jury; they rejected defendant's claims and found for the plaintiff.

C. Defendant claims that the verdict should be set aside because it is so grossly excessive as to clearly manifest that it was an expression of passion and prejudice. This resulted, he avers, from the fact that the action was tried in his home county where he was well known as a doctor and a comparatively wealthy man, by a jury who were lacking in the broadmindedness and tolerance necessary to appraise his conduct in its true light as only a breach of social standards, and who, being unjustifiably shocked by the impropriety of his conduct, threw reason to the winds and let passion and prejudice prevail in imposing what he characterizes as an unconscionable award of damages against him. The truth of this charge is clearly indicated, he says, by the fact that this appears to be the largest such award ever made in this state. Insofar as we are aware, this is true; it is not only the largest in the limited history of such cases in this state, but is among the highest to be found anywhere.

It might be observed that the largest award must be made for the first time, otherwise the first award ever made would become the maximum that ever could be recovered. The amount of this verdict has company in the range of verdicts for such

2. Rule 8(a) U.R.C.P.

wrongs. In the Vermont case of Woodhouse v. Woodhouse,[3] an action against parents for alienation of the affections of a husband, recovery of $125,000 was upheld; a verdict of $100,000, of which $25,000 was punitive damages, was affirmed in Mohn v. Tingley;[4] $75,000 was finally approved by the Ohio Appellate Court in Oskamp v. Oskamp[5] where a conspiracy existed to alienate the affections of a wife. It is true that special fact situations existed in these cases which are collated along with others relating to the excessiveness of verdicts in such actions at 69 A.L.R. 1282 which includes cases showing other verdicts in excess of $75,000 which had been modified by trial courts because the plaintiff had already had a property settlement in a divorce action,[6] or because the marriage was obviously of little worth to either spouse as a result of troublesome family life.[7] Under the facts, as we must assume the jury found them in the instant case, the reasons for reduction just stated are not present here. Although amounts assessed in analogous, though not exactly similar situations, are helpful as a general guide to the amount of damages that may properly be allowed, the import of all of the decisions we have examined upon this subject is that the amount of damages must be determined largely upon the particular facts and circumstances of the individual case.

Whether the verdict here is excessive is a perplexing question. No one will gainsay that the task of placing a monetary value upon the affections of a wife is fraught with grave difficulty. The valuation is of course not on a strictly out-of-pocket basis and cannot be computed solely from contributions of money to be expected, nor the value of domestic services alone. There are other intangible but definite values in the comfort and society, love and companionship, and other privileges attendant upon the estate of marriage for which compensation can be awarded, not only up to the time of divorce, but for permanent loss of such conjugal rights.[8]

The question of damages in such instance seems best addressed to the discretion of a jury; they have homes, spouses and children of their own, are experienced in the practical affairs of daily life, and have different points of view; and they are afforded the benefit of seeing and hearing the parties and their witnesses. Because of their advantaged position courts are extremely reluctant to interfere with their

3. 99 Vt. 91, 130 A. 758.

4. 191 Cal. 470, 217 P. 733.

5. 20 Ohio App. 349, 152 N.E. 208.

6. Overton v. Overton, 121 Okl. 1, 246 P. 1095; Scharwath v. Brooks, 145 A. 727,

7 N.J.Misc. 397, affirmed 150 A. 211, 8 N.J.Misc. 353.

7. Lindenberger v. Klapp, 254 Ill.App. 192.

8. Restatement of Torts, Vol. 4, Sec. 910, p. 559; Riggs v. Smith, 52 Idaho 43, 11 P.2d 358.

verdicts. This is necessarily so in order that the right of trial by jury assured under our law [9] be preserved. If courts were prone to set aside jury verdicts and substitute their own judgments therefor whenever they disagreed with the jury, the right would be abrogated and the jury system would be but a pretense. The concept of trial by jury necessarily presupposes that there is a wide area within which the pendulum of the jury's deliberations may swing without interference from the court. And so long as they remain within the boundaries of what reasonable minds could believe their findings should remain inviolate.

This does not mean that whenever one points his finger at another and accuses him of a real or fancied violation of his rights that a jury should be allowed to impose liability; nor, even that if a wrong has actually been committed, a jury must be given the privilege of dividing up the defendant's property with the plaintiff. It is and must be the responsibility of courts to determine in the first instance whether there is a reasonable basis upon which a jury could determine that a legal wrong has been done to plaintiff which would form the basis of recovery; and likewise to apply the general yardstick of "what reasonable men could find" to any damage awarded as compensation for an injury. If the verdict transgresses that limit so that it can properly be said that it is so grossly excessive that it must have been inspired by passion or prejudice, or by spite, envy, ill will or corruption, as contrasted with reason and justice, the verdict cannot be permitted to stand.

Pertinent to the present inquiry are the words of Chief Justice Wolfe, speaking for this court in the case of Pauly v. McCarthy [10] on the question of whether a verdict was so excessive as to require it to be set aside:

"The jury is allowed great latitude in assessing damages for personal injuries. * * * The present cost of living and the diminished purchasing power of the dollar may be taken into consideration when estimating damages."

Also,

" * * * the mere fact that it [the verdict] was more than another jury, or more than this court, might have given, or even more than the evidence justified, does not conclusively show that it was the result of passion, prejudice, or corruption * * *."

The Chief Justice there stated that before we could set aside a verdict as excessive, "the facts must be such that the excess can be determined as a matter of law, or the verdict must be so excessive as to be shocking to one's conscience and to clearly indicate passion, prejudice, or corruption on the part of the jury."

9. See Stickle v. Union Pacific R. Co., Utah, 251 P.2d 867, 871.

10. 109 Utah 431, 184 P.2d 123, 127.

■ The validity of the verdict in the instant case is reinforced by the fact that the trial judge has given his approval by refusing to vacate or modify it. As we stated in Geary v. Cain,[11] " * * * in case of doubt, the deliberate action of the trial court should prevail. Otherwise this court will sooner or later find itself usurping the functions of both the jury and the trial court, * * *."

■ There is no showing here of anything affirmatively done or said by the judge or jury which would indicate passion or prejudice, except only the amount of the verdict. The jury were properly advised of the elements they could consider in assessing the damages; they were entitled to accept the version of the plaintiff and his witnesses that the defendant wilfully and wrongfully alienated away the affections of Mrs. Wilson who was a capable, industrious and attractive woman, and who theretofore had been a loving and devoted wife and mother with whom plaintiff was rearing his children in a happy home. Were we to interfere, we know of no formula to substitute for the evaluation of this loss made by the jury except to substitute our own judgment for theirs as to the proper amount of compensatory damages. Viewed in the light of the principles hereinabove discussed, we do not believe the verdict here is so greatly excessive as to shock the conscience or so unreasonable that we are required to

rule as a matter of law that it cannot stand.

■ D. Punitive damages can be awarded in an action for alienation of affections, but only where there is a finding of malice.[12] It is defendant's position that the evidence would support no such finding; and further, that if punitive damages be allowed here, they would be recoverable in every such action, because by the nature of alienation of affections, it must always be a wilful wrong. The fact that it would be difficult,—perhaps impossible,—for a cause of action to arise for *negligently* alienating the affections of another man's wife does not necessarily mean that a defendant's conduct would always be such that a jury would find it to be malicious.

The trial court told the jury that before punitive damages could be awarded they must find from a preponderance of the evidence, "that the defendant wilfully and with gross and wanton disregard of the plaintiff's rights induced the plaintiff's wife to withdraw her affections from and desert plaintiff and give her love to defendant * * *." This instruction finds support in what we said in Rugg v. Tolman[13] in approving the statement on exemplary damages made in 12 A. & E. Ency.L. (2d Ed.) p. 28: " 'While the term "gross" is constantly used in this connection, many cases explain it by declaring that the rule of exemplary damages requires negligence in such degree

11. 69 Utah 340, 255 P. 416, 423.
12. See Annotation, 16 A.L.R. 1316.

13. 39 Utah 295, 117 P. 54, 57.

as to amount to wantonness and positive misconduct, manifesting a conscious disregard of the rights of others and a reckless indifference to consequences.'"

Without further detailing evidence, we observe briefly that even after Mr. Wilson and Mrs. Oldroyd had importuned him to stop, Dr. Oldroyd continued to make love to Geraldine. His counsel urged that he did not intend that she leave her husband and that he was "the most dismayed man in Utah County" when she did so. This may be so but the evidence is susceptible of a reasonable interpretation very much to the contrary. Moreover, defendant is chargeable with the natural and probable consequences of his conduct which would be to alienate the affections of the wife from her husband. The legal effect of such conduct was aptly characterized by the Supreme Court of Missouri in the case of Butterfield v. Ennis: [14] "The enticing away of another man's wife is an act inherently wrong and necessarily known to be wrong, and, if the alienation from the husband is intentionally done, the law implies [permits a finding of] malice from these facts." (We insert the bracketed words.) We conclude that the jury could reasonably believe that in continuing to make love to Mrs. Wilson after being warned to desist, the defendant did so wilfully and with such wanton disregard of the plaintiff's rights that an award of punitive damages was justified.

There remains, however, a serious apprehension as to the amount of punitive damages awarded ($25,000). Just as with compensatory damages, it is peculiarly within the province of the jury to determine whether exemplary damages should be awarded.[15] The verdict and its approval by the trial court in failing to vacate or modify it are entitled to deference. Yet as to the amount awarded, the situation is not exactly the same as it is with respect to compensatory damages. Such amount does not rest upon any loss suffered by the plaintiff; the compensatory damages are for that purpose. Punitive damages are awarded on the theory that it is permissible in case of certain aggravated wrongs to permit the private litigant, in the public interest, to impose a penalty upon the defendant as a punishment and to deter others from engaging in similar offenses. The reasons why the jury and the trial judge are particularly advantaged to fix compensatory damages are much less cogent here. For this reason we feel more at liberty to review and modify the award as to punitive damages.

There is no definite formula or basis upon which punitive damages can be computed. They have to fall within the limits of reason; "must not be so disproportionate to the injury and the actual damage as to plainly manifest that they were the

14. 193 Mo.App. 638, 186 S.W. 1173, 1177.

15. Evans v. Gaisford, Utah, 247 P.2d 431; see also cases at 16 A.L.R. 1316.

result of passion and prejudice"[16] and must be correlated with the other facts and circumstances shown in evidence including defendant's wealth.

E. As to admitting testimony concerning defendant's financial condition: It is for the trial judge to determine in the first instance whether the facts are such that malice can be found, and if so, it is well settled that it is proper to receive evidence and consider the wealth of the defendant as bearing upon the issue of punitive damages.[17] It is obvious that the same amount of money might be a greater punishment to a poor man than it would be to a rich one. Dr. Oldroyd is not only a successful practitioner but also has considerable wealth in sheep, lands and other properties aggregating to several multiples of the judgment rendered against him. Nevertheless, considering all of the facts and circumstances shown, including the fact that the defendant is already charged with a very substantial judgment for compensatory damages, we are of the opinion that the award of $25,000 as exemplary damages is excessive. This does not require a reversal, but we may order a reduction of the verdict.[18] We are of the opinion that the amount should be reduced to $5,000.

F. A point by point analysis of the numerous rulings on evidence assigned as error would unduly extend this opinion. They can be treated in two classes. One of them relates to questions asked Geraldine Wilson seeking to show lack of harmony in her marriage with the plaintiff. They were objectionable for various reasons: Some of them asked for hearsay as to conversations with her father; others asked her to give her conclusions as to her subjective interpretation of "conditions" during her marriage, or the "attitude" of Dale, and were often of such a general nature that they could call for answers violative of our statute [19] which provides, "a husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either during the marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage * * *." The trial judge correctly indicated to counsel that any knowledge of facts acquired out of the confidence of the marriage relationship must be excluded, and further indicated that the questions should be specific enough so he could properly rule as to whether they would bring forth answers susceptible of the above objections. Mrs. Wilson was both willing and anxious to testify for Dr. Oldroyd and against the plaintiff. Actually she was permitted to

---

16. Evans v. Gaisford, supra, 247 P.2d at page 435.

17. Restatement of Torts, Vol. 4, Sec. 908 (2); Kilgore v. Kilgore, 154 Fla. 841, 19 So.2d 305; see also 16 A.L.R. 1321.

18. Duffy v. Union Pac. R. Co., Utah, 218 P.2d 1080 and authorities therein cited.

19. 78-24-8 (1) U.C.A.1953.

testify fully as to difficulties in her married life with plaintiff, the absence of conveniences in their home, her husband's lack of consideration for her, and that she had lost all affection for him before the doctor entered her life, which evidence, if believed, would have sustained defendant's contention that there were no affections to alienate.

 The other class of evidence which defendant says was improperly excluded consists of questions put to Dale Wilson on cross examination, purportedly to impeach his testimony that his marriage was happy. Defense counsel attempted this by reading portions of his wife's testimony and deposition taken in the divorce proceedings concerning their marital difficulties and then asking plaintiff: "Did you hear your wife so testify?"—or "Did you know she had so sworn?" Defendant then urged and now insists that he was entitled to ask these questions, not to prove the truth of her statements but that Mr. Wilson heard her so testify. Counsel has not made us acquainted with any rule, reason or authority which supports this proposition and we are aware of none. It seems to have been a plain attempt to get these statements of Geraldine criticizing her husband and their marriage in the record as substantive evidence. She was present at this trial and testified first hand to her version of the lack of serenity in the marriage. Her former

testimony could not impeach Mr. Wilson for it showed no prior inconsistent statement by him. Nor could the fact that he heard it be considered as an admission against his interest because it was given in a proceeding where he had neither duty nor opportunity to deny or explain.[20] Whether he heard such statements or not would in no way tend to vary, explain or contradict his testimony. He had not said, and it was not his contention, that the marriage was happy at the time of the divorce proceeding, but only up to his wife's "romance" with Dr. Oldroyd. Judge Hoyt appears to have been patient and fair in his rulings which were uniformly correct in excluding a good deal of incompetent evidence. We find no indication that any proper evidence was excluded to the prejudice of the defendant.

 G. Defendant maintains that the judge's instruction that " * * * so long as the marriage status continues between a husband and wife, the law presumes that there is a possibility of reconciliation even though they have become estranged or have had marital differences * * *." Misled the jury by telling them that there was a presumption of the possibility of reconciliation which they could weigh against other evidence. Although the concept of "presumption" has been burdened with a great deal of mystification by legal writers and judges, fortunately the lay jurors are blissfully unaware of its mysterious implications. They undoubtedly understood the

20. IV Wigmore on Evidence, 3rd Ed., Sec. 1072, p. 86.

term simply in its ordinary sense as an equivalent to such phraseology as "the law considers" or "the law takes cognizance of" the possibility of a reconciliation. The instruction gives the jury its true meaning by continuing, "it is therefore wrongful and unlawful for another man to court or make love to a married woman or to wilfully encourage her to give up her affection, *if any*, for her husband, * * *." If this were not so any person could with impunity make love to a married woman where there had been friction or estrangement; such is not the law. We do not believe the instruction given is susceptible of the misunderstanding claimed by defendant.

 It is true that there may be great or little affection and that the damages should be proportionate to that which is taken away from the husband. In other instructions the court amply safeguarded the defendant's theory in regard thereto by expressly so advising the jury. He also instructed, "If the acts or conduct of the plaintiff himself, or any other cause than the acts of the defendant constituted the controlling cause, * * *" of plaintiff's loss of affections, then he could not recover, and conversely told the jury that the same would be true "if the plaintiff's wife fell in love with defendant without any affirmative inducement or encouragement from the defendant * * *." And further, "in any

event you should not hold the defendant liable unless you find from a preponderance of the evidence that the wrongful acts or conduct on the part of the defendant were the controlling cause of inducing the plaintiff's wife to withdraw her affection from the plaintiff." The instructions viewed as a whole, fully and fairly presented defendant's various theories of defense and were in no way prejudicial to him.

The judgment as to punitive damages is reduced to $5,000; the judgment as so modified is affirmed.

Each party to bear his own costs.

McDONOUGH and WADE, JJ., concur.

HENRIOD, Justice (concurring).

Since the main opinion reduces the punitive damages to the figure noted, I concur. I would have concurred more readily had such damages been eliminated altogether and could we have reduced substantially the compensatory damages. The record reflects that plaintiff himself was not entirely free from indiscretion, and the type of action he pursues is frowned upon in some jurisdictions, to the point where, together with similar actions, it has been abrogated by statute,—for obvious reasons.[1]

WOLFE, C. J., does not participate herein.

1. McCurdy, Cases Domestic Relations, 3rd Ed., p. 684; See Feisinger, Current Legislation Affecting Breach of Promise, Alienation of Affections and Related Actions, 1953, 10 Wis.L.Rev. 417.