Dennis PRINCE, Plaintiff and Respondent,

v.

Darlene PETERSON, Defendant and Appellant.

No. 13765.

Supreme Court of Utah.

July 22, 1975.

Gary D. Stott, of Stott & Young, Provo, for defendant and appellant.

Dave McMullan, Payson, for plaintiff and respondent.

CROCKETT, Justice:

Dennis Prince sued Darlene Peterson for slander uttered and libel published against him.[1] Upon issues joined and a plenary trial by jury a verdict was rendered for $5,537 compensatory and $3,000 punitive damages. From judgment entered thereon

---

1. It is said that the generic term "slander" was used in early common law to include all defamatory expression including both libel and slander. But in more modern times libel refers to writing, or other publication intended for visual perception, whereas slander refers to defamation by spoken words. See 50 Am. Jur.2d 515. The dissenting opinion suggests that this case does not involve the oral slander. In their opening statements, counsel for plaintiff and defendant each talked about both the *written libel* and the *oral slander*; and the trial was concerned with both. Defendant has made no contention either in that court, or in this court that oral slander was not involved.

and the court's refusal to interfere with the verdict or grant a new trial, defendant appeals.

Defendant contends (1) that the statements made were not slanderous; (2) that the verdict of $5,537 as compensatory damages was not justified by the evidence, and especially so because the complaint sounded only in general damages and failed to plead expressly for special damages; and (3) that the award of $3,000 punitive damages was not justified, and in any event was an excessive award resulting from passion and prejudice of the jury.

Property upon which Denny's Cafe was situated had originally belonged to the Williams family. Defendant Darlene Peterson and the plaintiff's deceased wife were sisters therein. Grandpa and Grandma Williams had deeded the property to the four children of plaintiff and his wife (thus the Williams' grandchildren), but with a life estate therein to the plaintiff's wife, their daughter, Marion W. Prince, who died before the occurrences of concern here. The evidence is that for good and valuable consideration, satisfactory to the children, the latter had each conveyed their interest in the property to their father, plaintiff Dennis Prince.[2]

It is also shown that plaintiff had taken over the business 37 years before when it was a small lunch stand and worth about $500. By his work, management, and upbuilding of the business, including several renovations and additions, had increased its value so he thought it was worth about $75,000, which is the price he finally got on the sale contract. It was in June 1973, after he began efforts to sell, that he learned that the defendant was telling his prospective buyers and others that he was crooked and dishonest in his business dealings and was cheating his own children.

Whether motivated by family jealousy, or simply by innate spite or some other provoker of ill will we need not determine. That the jury could have believed that defendant was unrestrained in attempting to malign and injure plaintiff by making both oral and written untrue and defamatory statements about him is not open to question.[3]

One significant paragraph from the record, part of the testimony of Mrs. Lola Ostler, to whom plaintiff was trying to sell his cafe, is:

A She referred to him as "Pa put it the way it was because he knew what kind of a person Dennie was." And she said he was a "no good, drunken, woman-chasing, crooked bastard, . . ." it shocked me, because I though Darlene and Marion and the whole family got along just fine. And she said, "There's going to be a letter in the mail to you regarding some property that's not right." And she says, "You'd better watch you step because he's a crook."

The letter was sent; it contained, inter alia, the following:

"I feel you people should be warned as to the clever crook you are dealing with. That property belonged to the late Thos. Williams and his wife Nora Williams. They deeded that property to their four grandchildren, Marilyn, Carma, Tom and Nadine Prince, but Marion their daughter was to have it as long as she lived. But Dennie in his crooked clever way has taken it away from his kids."

We have no disagreement with the defendant's contention that simply making some general statement about another being a crook, or even using profanity against in a general way, may not be actionable slander. It may well depend on

---

2. We look at the evidence in the light favorable to the jury's verdict and the judgment, and assume that they believed those aspects thereof which support it: see Memmott v.

United States Fuel Co., 22 Utah 2d 356, 453 P.2d 155 (1969).

3. This relates to the punitive damages issue, see footnote 9 below.

the circumstances.[4] If words of that character are used in such a context or under such circumstances as they would reasonably be understood to come within the traditional requirement of libel or slander: that is, to hold a person up to hatred, contempt or ridicule, or to injure him in his business or vocation, they are deemed actionable per se; and the law presumes that damages will be suffered therefrom.[5] Reflection upon the expressions uttered here: calling the plaintiff names, including that he was a "clever crook," etc. "who is stealing from his own children. . ." referring to his operation of a business, and his efforts to sell it, leaves no doubt that they could reasonably be regarded as falling within the rule of law just stated.

In addition to the consideration of general damages which the law presumes will follow from such a defamation, the plaintiff testified with respect to particular losses he sustained: that from the time he learned of defendant's wrongful conduct, in June, 1973, until he was finally able to close the bargain on August 8th, he spent a good deal of his time in trying to overcome the harm being done by the defendant, viz.:

I spend all of this time . . . proving to my clients, that I wanted to buy the place, that I was not a crook and that I had all the papers.

\* \* \* \* \* \*

I figured it took practically all of my time for 25 days.

\* \* \* \* \* \*

. . . notbody else, I think, would work for less than $30 a day.

\* \* \* \* \* \*

Q So you have discussed this matter with your customers—

A I have talked about it. I had to. We were asked questions about it. Everybody that came in wanted to know. It was common gossip throughout the whole town.

■ In regard to the claimed deficiencies in the pleading and proof of damages, these observations are to be made: the purpose of pleadings is to advise the opponent and give him an opportunity to meet the issues and the contentions.[6] If that purpose is served, the requirements of the law are met.

■ The distinction between general and special damages was pointed out by Justice Ellett in our recent case of Cohn, etc. v. J. C. Penney Co. et al.[7] It will be seen therefrom that general damages are those which, from the common sense and experience of mankind, would naturally be expected to result from that type of a wrong to any person so injured. Whereas, "special damages" means particular items of damages which result from circumstances peculiar to the case at hand. It is this type of damages which should be specially pleaded and proved by evidence showing such circumstances in the individual case. Measured by the standards herein discussed, and as applied to the issues joined and tried in this case, we see no er-

4. Nichols v. Daily Reporter, 30 Utah 74, 83 P. 573 (1905); Western States Title v. Warnock, 18 Utah 2d 70, 415 P.2d 316 (1966). That it is generally held that the written or printed words "crook" and "crooked" are actionable per se if they are used in a situation or context where they would reasonably be understood to impute dishonesty, or other defamatory connotation, or where they hold the one to whom they refer to up to hatred, contempt, or ridicule, see Stevens v. Snow, 191 Cal. 58, 214 P. 968; Pandolfo v. Bank of Benson, 273 F. 48 (CA 9 Ariz.); Smith v. Pure Oil Co., 278 Ky. 430, 128 S.W.2d 931;

Uhlman v. Farm, Stock & Home Co., 126 Minn. 239, 148 N.W. 102; 50 Am.Jur.2d 579.

5. See 50 Am.Jur.2d 869; 53 C.J.S. Libel and Slander § 239, p. 362; not involved here, the common law also included the imputation of unchastity to a female, and of a loathesome disease to anyone.

6. See Taylor v. E. M. Royle Corp., 1 Utah 2d 175, 264 P.2d 279 (1953); Morris v. Russell, 120 Utah 545, 236 P.2d 451 (1951).

7. See Cohn v. J. C. Penney Co. et al., Utah, 537 P.2d 306 (May 1975).

ror or impropriety which resulted in any substantial prejudice to the defendant.

■ It is of course to be appreciated that there are difficulties involved in placing an exact dollar-and-cents valuation on damages caused by an injury of this character. However, when physical injury is involved, courts have no hesitancy in allowing and approving substantial awards as general damages which include pain and suffering. The pain and suffering inflicted upon the mind and the emotions by such wrongful act of another is no less real; and should be no less entitled to be compensated for.

■ We frequently declare our commitment to the jury system, under which it is the prerogative of lay citizens to determine questions of fact, both as to liability and the fixing of damages; and in cases of this character their varied experiences and their closeness to the reality of everyday affairs qualify them to fix damages as well as or perhaps better than judges.[8] The court should give the jury system more than lip service, by honoring the jury's prerogatives; and by declining to interfere therewith unless the determinations made are entirely without foundation in evidence, or are so fragmentary and unsubstantial that no reasonable minds acting fairly on the evidence could have so concluded. In addition to what has been said concerning the fact that the jury seems to have sensed what had occurred and to

have done justice concerning it, the trial court also indicated his approval by refusing to interfere with the verdict or to grant a new trial.[9]

■ Notwithstanding what we have said above concerning the compensatory damages, the fixing of punitive damages presents a somewhat different type of problem. These damages can be awarded if the jury finds that such an injury was wilful and malicious.[10] They are awarded not so much to reward plaintiff for loss as to punish the defendant for a wilful and malicious wrong and to serve as a wholesome warning to others not to engage in similar wrongful conduct. In doing this the jury exercises a quasi-judicial function.[11] The rule is that such damages must bear some reasonable relationship to the actual damages found. In applying that standard here we think the $3,000 damages was excessive, and should be reduced to $1,000. Except for that modification the judgment is affirmed. In view of the substantial modification of the judgment, the parties shall bear their own costs.

ELLETT and TUCKETT, JJ., concur.

HENRIOD, Chief Justice (dissenting):

Appeal from a judgment entered on a jury verdict of $5,537 compensatory and $3,000 punitive damages for an alleged libel (which counsel for both sides called an action for libel *and* slander).[1]

8. That juries are and should be allowed broad discretion in fixing such damages see Prosser, Torts, 4th Ed., p. 761, and numerous examples there given; also see 50 Am.Jur.2d 893; and statement in Wilson v. Oldroyd, 1 Utah 2d 362, 267 P.2d 759.

9. See State Road Commission v. Kendell, 20 Utah 2d 356, 438 P.2d 178; and see Geary v. Cain, 69 Utah 340, 255 P. 416, wherein Justise Thurman asked the pertinent question on the fixing of damages: What assurance is there that our (this court's) judgment would be more accurate than that of the jury?

10. See Mecham v. Foley, 120 Utah 416, 235 P.2d 497; Falkenberg v. Neff, 72 Utah 258, 269 P. 1008.

11. Ibid., and see Evans v. Gaisford, 122 Utah 156, 247 P.2d 431.

1. A one-page complaint averred a malicious publication of a libelous letter written by defendant to Mr. and Mrs. Ostler (friends and neighbors for many years), two of four joint buyers of plaintiff's restaurant business, which letter allegedly was read to "numerous" other people, and which was as follows:

"I feel you people should be warned as to the clever crook you are dealing with. As you know that property belonged to the late Thos. Williams and his wife Nora Williams. They deeded that property to their four grand children, Marilyn Prince, Carma Prince, Tom Prince and Nadine Prince but

The chronology of events that vitriolized the atmosphere in which this case found itself, and the attendant facts, fairly may be stated briefly, without any serious dispute, as follows:

Many years before the negotiations for sale of a restaurant ripened into a contract the defendant's father and mother, named Williams, had deeded the property to their four grandchildren, Thomas, Carma, Marilyn and Nadine Prince, who were children of plaintiff Prince and his wife, reserving a life estate to the wife, Williams' daughter, who died before the sale of the restaurant mentioned above. Over the years and prior thereto, the plaintiff and father of the four children referred to, obtained deeds to the property from all of them, and at time of negotiation for the sale, Prince had a marketable title thereto. An Earnest Money Agreement thereafter was executed calling for earnest money (which was paid) and transfer of title on or before August 1, 1973, on payment of $20,000 down and monthly payments thereafter, commencing on September 1, 1973, on the balance of the $75,000 purchase price.

About a week after the Earnest Money Agreement of July 3, 1973, and on July 10, Mrs. Peterson, defendant and sister-in-law of plaintiff Price, knowing of the sale, called Mrs. Ostler, one of the buyers, and discussing fence lines, among other things, told the latter on the phone that Prince was crooked and was stealing the property from his own kids. These unkind and unsisterly-in-law-like epithets were endorsed, apparently without recourse, and as a possible negotiable instrument of defamation, in the letter recorded in footnote 1 above (which see), that was postmarked July 11, 1973. Five days later, on July 16, 1973, Prince the seller, obtained a title insurance policy on the property, almost obviously in connection with the sale contract and an

obligation therein. Two days later, on July 18, 1973, the complaint in this case was filed. On July 27, 1973, nine days thereafter, a Uniform Real Estate Contract was executed crystallizing the rights and obligations of the parties, after which on August 3d or 4th, 1973, the buyers, one of which was Mrs. Ostler, took possession and started cleaning up the place, after which the finalizing papers were executed on August 8, 1973, the entire transaction being completed by binding payment as provided, and transfer of possession,—almost to the day contemplated,—about as expeditiously according to the parties' intentions as prevails in the average case.

Under such facts, and the rapid pace set in winding up the sale, the protestations of the plaintiff that he was delayed in selling the property for 25 days as a result of the letter mentioned, because of indecision on the part of the buyers, must fall on deaf ears, for the reason that obviously he was not unnecessarily delayed and as obviously he was in no way damaged in effecting the sale by anything, since there was no reneging on, or breach of the contract,—all of its conditions completely having been accomplished without any loss. Any claimed damage to his reputation as a business man or by loss of business is equally unconvincing, since he proved none,—asserting only that he was damaged because of delay in executing the contract,—all of which not only obviates the pressing of any argument as to whether the content of the letter was defamation per se or per quod,—as courts frequently have discussed. By the same token this court should eliminate any necessity for reciting that part of Prince's testimony relating to such urged, but nonexistent damage. Any other conclusion, after examining the record here, would lead to a finding that the verdict was infected by prejudice,—a contention urged by defendant.

Marion their daughter was to have it as long as she lived but Dennie in his crooked clever way has taken it away from his kids. If grandpa Williams had wanted him to have that property he would have left it to him.

Here is a copy of the deed as to how grandpa Williams left his property and you judge for yourself if something crooked hasn't been pulled."

There were hints or references to an amended complaint. The record is devoid of such an instrument.[2] The only allegations found in the record are those mentioned in footnote 1, supra.

The record here, that only claims damages flowing from the defamation reflected in the letter and its publication, is that to which we are confined by reason of traditional and oft-repeated concepts that we will examine only that which is before us in the record and nothing dehors of it. The main opinion ignores this precept. The record here shows only a publication to the buyers and the plaintiff and the members of his immediate family, of the property, who did not pass it along to anyone else, so far as the record reflects. The bulk of the testimony, mostly hearsay, had to do with Mrs. Peterson's *slandering* Prince to others, independently of the letter, which circumstance in no fashion appears in the pleadings,—and not much, even, in the immaterial proof. All this should impel us to send the case back for trial if for no other reasons than that the jury was prejudiced, either by emotion or comparatively small town provincialism, or that it deliberated and determined excessive damages based on evidence supporting some other cause of action or theory that simply *cannot be found in the pleadings before us.*

The abstract of the facts above stated relates an undisputed factual recital. Any controversial facts evoked in this case seem to have been adduced by the plaintiff himself, who lost nothing, but sold out for an unconscionable, un-Christian profit, which not only weakened his cause but strengthened the conclusion of prejudice on the part of the jury. For example:

Mr. Prince was either mistaken about or misconstrued undisputed facts in the anachronism of this case when he testified that there were no problems about the sale until after the date of the letter (July 11th), but he was delayed in effecting it for 25 days, when the sale, at best, was delayed for five days at closing time; that he heard about the defamation about June 25th, before the letter, subject to his complaint, was written; that he lost $30 per day for 25 days, with no proof save his say-so; that he lost $87 interest whereas none was due under the very terms of the contract; that[3] he said he had paid his children nothing for their conveyances which were based solely "out of love and affection," and "absolutely love and affection is all they got out of it," whereas, on cross-examination at the trial he admitted he had paid each of his four children $5,000, which seems to lend some credibility to Mrs. Peterson's statement in her letter that he had taken the property away from his kids, i. e., had paid them $20,000 for property he sold for $75,000.

There is considerable talk about whether calling one a "crook" is libel or slander per se or per quod and as to whether in such event the damages must be pleaded and proved or pleaded without proof of special damages. There are authorities both ways, including some issuing from our own court,[4] but in view of our conclusion arrived at by examining the record and the facts germane thereto, it is deemed unnecessary to indulge in the luxury of analysis, distinction between, refinement of or rhetoric apropos such citations.

MAUGHAN, J., concurs in the result of the dissenting opinion of HENRIOD, C. J.

2. The main opinion's citation of Taylor v. Royle, in its footnote 5, is inaccurate and disarming as applied to this case.

3. In his deposition.

4. Nichols v. Daily Reporter, 30 Utah 74, 83 P. 573 (1905); Western States Title v. Warnock, 18 Utah 2d 70, 415 P.2d 316 (1966); 1 A.L.R.3d 844 (1965); Cinquanto v. Burdett (Colo.) 154 Colo. 37, 388 P.2d 779 (1963).